Guy Mangauo, J.
This is an article 78 proceeding to review an order of a lower court Judge barring petitioner, while wearing his clerical collar as an ordained Eoman Catholic priest, from representing a defendant in the selection of a jury and in the trial of a criminal proceeding. The basis of the lower court order is that ‘ ‘ there would be a substantial danger that jurors would draw impermissible inferences in the defendant’s favor as to her character and veracity”; that “ [w]hile it can be assumed that most jurors would react favorably to petitioner if seen in a clerical collar, there is always the possibility that some reactions might be adverse ’ ’ and that ‘ ‘ long experience in the criminal justice system has established that irrationality and bigotry cannot always be eliminated; [so] that some prospective jurors * # * will fail to follow the court’s instructions.” '
Petitioner alleges that, in over 24 years since his ordination, he has always worn his clerical collar in his everyday activities. He has appeared before -the Character Committee, was sworn in as a member of the Bar, had tried nonjury actions, all, while wearing his clerical collar. Petitioner contends that the court’s barring him from representing defendant in a criminal jury trial because of his clerical collar deprives him of his basic constitutional privileges; the right of free exercise of religion, and the right to practice law. .
The lower court’s order presents no complex issues of prevention of free exercise of religion, or of favoring a religion, or of misconduct of an attorney in appearing at court wearing distinctive, religious garb. The petitioner’s dress is not claimed to be immodest, bizarre or an affront to the dignity of the court, or an attempt to obtain an unfair advantage in the selection of the jury (see Matter of Peck v. Stone, 32 A D 2d 506). There is thus, but one fundamental issue to be considered, namely: the authority of a presiding Judge to determine, as a matter of law, that the outerwear of an attorney, be it a clerical collar, skull cap, crucifix, star of David, or other religious or societal emblem or medallion, distinctive of his faith, or belief will so prejudice the state of mind of a jury panel as is likely to preclude it from rendering an impartial verdict.
*125 Unfortunately, Mas to a greater or lesser degree has existed since the memory of man. Recognition of that fact is found in the statutory safeguards of our judicial system. But to assume from outward trappings or from eminence of trial counsel, a Mas that rebuts the presumption of a prospective juror’s impartiality is to enter into the realm of speculation that leads to the disqualification of entire classes of people from jury service. It is a predetermination that a juror cannot lay aside Ms impression or opinion and render a verdict based solely on the evidence presented (see People v. Genovese, 10 N Y 2d 478). This is no new concept being expounded by this court.
In Purple v. Horton (13 Wend. 9, 22) Chief Judge Savage in 1834 speaking with prophetic vision, rhetorically asked, “Is it true that persons belonging to the same society * * * are ipso facto prejudiced in favor of every person belonging to the same society * * * so that they cannot decide a question of fact impartially between them and other persons? Whatever may have been the state of society in the days of Punch and of Blackstone, it is not so now.”
Closer to the instant case is Searle v. Roman Catholic Bishop of Springfield, (203 Mass. 493, 498) wherein a Roman Catholic Bishop was sued for alleged conversion of a wooden building, considered as personal property, situated on the land of the Roman Catholic Bishop of Springfield, a corporation holding title to the realty for the Roman Catholic Church. The ruling of the lower court that no person of the Roman Catholic faith should sit as a juror in that case was reversed as “it could not successfully be contended that holding the same religious belief as one of the parties, or affiliation' with him in the same church, would disqualify a person from sitting as a juror in his case. The application of such a doctrine would be unjust and impracticable.” To the same effect, see Barton v. Erickson (14 Neb. 164 [1883]) wherein the Lutheran Church was involved, and United States v. Eagan (30 F. 608, 609 [1887]) wherein the court would not bar a juror “ for the fact that a juror belonged to one party, and was a strong partisan * * * any more than a challenge on the ground that he belonged to one church, and was a strong and bigoted adherent of that church.” Exclusión of entire classes of people from the jury on grounds of implied prejudice has not been favored by our courts nor may “bias or lack of impartiality of fairness * * * be inferred ás a matter of law.” (People v. Reilly, 71 Misc 2d 227, 229; Hildredth v. City of Troy, 101 N. Y. 234; Fishbaugh v. Armour & Co., 185 F. 2d 541, cert. den. 342 U. S. 914.)
*126 The strength and confidence of a citizenry to render an impartial verdict is not weakened by the fact that a prospective juror had a prior opinion or an acquaintanceship with .or dislike of a trial attorney or been a client of either , of trial counsel. See People v. Wolter (203 N. Y. 484) and People v. Genovese (10 N Y 2d 478, supra) which held that the prior opinion of a juror was no bar; Garland v. United States (182 F. 2d 801) where mere relationship to a prosecuting attorney was no bar; Lane v. United States (321 F. 2d 573, cert. den. 381 U. S. 920); Carpintero v. United States (398 F. 2d 488); Daut v. United States (405 F. 2d 312, cert. den. 402 U. S. 945) where being friends of or having attended law school together with the prosecuting attorney was no bar; People v. McQuade (110 N. Y. 284) where being a former client to trial counsel was no bar; Bateman v. United States (212 F. 2d 61) where the mere having of some prejudice against one of the attorneys was no bar; and United States v. Nadaline (471 F. 2d 340) where even relationship to the foreman of the jury was no bar. As was best summed up in Peerless Ins. Co. v. Schnauder (290 F. 2d 607, 610, cert. den. 368 U. S. 830) the fact that the three jurors involved were — “one * * * because he had known the attorney ‘ many many years ’. Another had known him ‘ for some time ’£ just as a friend. ’ The third knew him 1 personally -’ £ quite a number of years ’ having £ met him at different occasions,’and at£ social functions ’ * * * were [nevertheless] improperly excused.”
The qualifications of prospective jurors and the grounds for their discharge were fully set forth in chapter 6 of the Code of Criminal Procedure and thereafter and as re-enacted with greater safeguards in title J of the Criminal Procedure Law. Both statutes provided, among other qualifications £ £ a state of mind that is likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the time” (CPL 270.20, subd. 1, par. [b], Code Crim. Pro., § 376, subd. 2). The “ 1 state of mind ’ referred to * * * as a ground of challenge for cause, means actual bias as contrasted to implied bias.” (People v. Prior, 268 App. Div. 717, 721, affd. 294 N. Y. 405.) “ Implied bias ” under the old code was expressly limited by definition to only those cases set forth in subdivisions 1 through 8 of section 377. In the new Criminal Procedure Law the words “ implied bias” were eliminated as the trend and rationale of decisional law is that unless the prospective juror lacks the specified statutory qualifications (listed in CPL 270.20), he cannot be barred from service upon speculative implications or assump *127 tions of bias. Prejudice must, in fact, be shown and may not be presumed as a matter of law, and must be established as a demonstrable reality (Dennis v. United States, 339 U. S. 162; United States v. Haynes, 398 F. 2d 980, cert. den. 393 U. S. 1120; Hildreth v. City of Troy, 101 N. Y. 234, supra, and People v. Reilly, 71 Misc 2d 227, supra).
If the outward clerical collar or other symbol denoting religious faith and integrity be barred, then what test other than voir dire may be applied to a trial counsel in a local community who, despite the normal streetwear, is better known to the residents of the community for his much publicized meritorious work as a church leader and as a man of honesty and integrity? If voir dire is employed in one instance, it should be employed, with equal force, in the other. Voir dire is the very cornerstone of jury selection. To deny voir dire, its full significance is to relegate it to the category of a useless appendage, the coccyx of the law jury qualification and selection. “ The statute makes elaborate provision for an impartial jury. * * * The law prescribes the qualifications of jurors. The court cannot add to or detract from them. It cannot itself select the jury, directly or indirectly. It cannot in its discretion, or capriciously, set aside jurors as incompetent, whom the law declares are competent, and thus limit the selection of the jury to jurors whose names may be left. If1 this is done a legal right is violated, for which an appellate court will give redress.” (Hildreth v. City of Troy, 101 N. Y. 234, 239.) “The voir dire * * * is an effective and practical method of resolving on a factual basis the otherwise debatable and speculative question whether a fair and impartial jury can be selected.” (United States v. Hoffa, 156 F. Supp. 495, 500 [S. D. N. Y.]; see, also, United States v. Dellinger, 472 F. 2d 340, cert. den. 410 U. S. 970.)
The concept of voir dire is so ingrained and protected in our law that in State Bank of Beaver County v. Hollingshead (82 Utah 416, 42A-425) a trial court was not permitted to “peremptorily or for cause or bias * * * challenge or excuse a juror of its own motion. The right to challenge rests with the parties * * *. The fact that a juror sustains the relationship of a debtor or creditor, master or servant, partner or united in business, with either party does not disqualify the juror to act, but it gives the litigant the right to challenge for cause.” (See, also, State v. Royster, 181 S. C. 269.)
As was stated by Mr. Justice Holmes in Holt v. United States (218 U. S. 245, 251 [1910]), “ If the mere oportunity for prejudice or corruption is to raise a presumption that they exist, *128 it will be hard to maintain jury trial under the conditions of the present day.” (Emphasis added.)
This court, in the context of Irvin v. Dowd (366 U. S. 717) and Estes v. Texas (381 U. S. 532), has considered the possible ‘ ‘ psychological impact ’ ’ upon a juror viewing, throughout the trial, an attorney garbed as a clergyman. In the Irvin case there was a direct assault by the news media upon the entire community of 60,000 inhabitants. The extremes, of repertorial conduct included interviewing on public streets and broadcasting the opinions of the local citizenry ■“ as to petitioner’s guilt [and] even as to what punishment he should receive ” (p. 725) ; the continuous “barrage of newspaper headlines, articles, cartoons and pictures * * * unleashed against [defendant] during the six or seven months preceding his trial ” (p. 725); “ caused a sustained excitement and fostered a strong prejudice ” (p. 726) so that the “psychological impact” on the jurors swayed the court in holding that the jurors’ declaration of “ impartiality can be given little weight.” (p. 728).
In the Estes case, the court was presented with the effect of televising the entire trial and the “ conscious and unconscious effect * * * [it] may have on the juror’s judgment”. (p. 545.) Little regard was given to the State’s contention that the effects of televised proceedings ‘ ‘ are for psychologists because they are purely hypothetical.” (p. 550.) However, in denying the telecasting of the trial, the court was not concerned with bias but with other factors that prevented a fair trial, namely, the unusual publicity, the aura of a cause célebre the impact on witnesses so that “ some may be demoralized and frightened, some cocky and given to overstatement; memories may falter, as with anyone speaking publicly” (p. 547), distraction of jurors, and the ultimate buildup of a prejudicial unfair trial.
No emotional assault is here made upon any prospective juror. The presence of a clerical collar or a skull cap in our social milieu, in our political and governmental functions is no unusual phenomenon. The prejudices of the past have been tempered by the involvement of our clergymen in the now open citadels of public life. We cannot nor may we build bars on an evanescent presumption to bias, presumably triggered by the sight of religious trappings. We may not indulge in an assumption that every jury panel will have members of a religious denomination who will violate their religious teachings and favor petitioner, despite the evidence presented. Nor, may we presume that every *129 juror has an impenetrable wall of antagonism preventing fair consideration of the evidence as elicited.
To adopt the view that every jury panel will be biased as a matter of law is to condemn our entire society to bigotry and to deny voir dire its function that has been hallowed by precedent and statute.
Irrespective of the law in some foreign jurisdictions, this court finds no statutes or court rules that restrict a clergyman from being admitted to the Bar of the State of New York, or place limitations on his usual attire. There is no statutory presumption of prejudice against a religious collar, cloak, skull cap or other distinctive symbol of a religion or people. Without such legislative "or judicial proscriptions, this court must hold that the lower court was without authority to bar petitioner from the trial court while wearing his clerical collar and to bar a client from retaining a clergyman, particularly 1‘ since this is a criminal case, the constitutional right of the accused to the assistance of counsel of his own choice reinforces this principle. ’ ’ (Lefton v. City of Hattiesburg, 333 F. 2d 280, 286.)
Accordingly, the petitioner’s application is in all respects granted.