279 N.J. Super. 293 (1995)
652 A.2d 767
YEFIM RYSLIK, PLAINTIFF,
v.
ROBERT W. KRASS, MARCELLUS FIELDS AND CELESTINE FIELDS, DEFENDANTS-RESPONDENTS, AND REV. FRANCIS J. BURLA AND IMMACULATE CONCEPTION CHURCH, DEFENDANTS-APPELLANTS. GALINA RYSLIK, PLAINTIFF,
v.
ROBERT W. KRASS, MARCELLUS FIELDS AND CELESTINE FIELDS, DEFENDANTS-RESPONDENTS, AND REV. FRANCIS J. BURLA AND IMMACULATE CONCEPTION CHURCH, DEFENDANTS-APPELLANTS, AND YEFIM RYSLIK, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued January 17, 1995.
Decided February 7, 1995.
*295 Before Judges DREIER, VILLANUEVA and BRAITHWAITE.
William A. Cambria argued the cause for appellants (Mr. Cambria of counsel; Lawrence F. Rosello and Theresa E. Mullen, on the brief).
Gerald J. Helfrich argued the cause for respondent Robert W. Krass (Ryan & Gannon, attorneys; Audrey Benson, on the brief).
Joseph E. Kelley argued the cause for respondents Marcellus and Celestine Fields (Maloof, Lebowitz & Bubb, attorneys; Mr. Kelley, on the brief).
*296 No briefs were timely filed by plaintiffs Yefim and Galina Ryslik.
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant Francis J. Burla and the Immaculate Conception Church appeal on leave granted from the order of the trial judge sua sponte that, inter alia, set aside the jury's liability verdict that exonerated them of liability and directed a new trial in these consolidated cases. The judge further determined that he should not have permitted one party, a priest, to appear in clerical garb (a dark suit and Roman collar) during the trial. This case grew out of a four-car collision in which the jury apportioned liability: zero percent to plaintiff, Yefim Ryslik, the driver of the first car; seventy percent to Robert W. Krass, the driver of the second car; thirty percent to Celestine Fields, the driver of the third car; and zero percent to Francis J. Burla, the driver of the fourth car, owned by the church. The judge set aside the jury's liability apportionment among the defendants only, preserving the finding that plaintiff was not negligent.
Defendant Burla, a Roman Catholic priest, testified that he was travelling forty to forty-five miles per hour when the car ahead of him stopped suddenly, at which time he hit his brakes and then realized that he was not going to stop in time. He hit the car in front of him. At his deposition, he said that he "plowed into" the Fields vehicle, but testified at trial that it was "not much of a jolt." The only damage to the rear of the third car was a broken right taillight, and the only damage to the front of Burla's car was a damaged grill. The damage to the front of the Fields car, however, was extensive, as was the damage to the rear of the Krass vehicle. According to Krass, although not crushed like an accordion, his car's damage was "extreme." It looked "like it was smashed from the front and smashed from behind." According to Fields, she could not assess her front-end damage as her car was not examined by her after the accident, but it was "attached" to *297 the car in front. The force of the impact with the Krass vehicle was sufficient to throw Ms. Fields forward so that her head broke the front windshield. According to plaintiff, the second and third cars looked like "accordions," and Krass just after the accident allegedly stated: "Oh, my God, this is like my fault."
Under the second and third drivers' theory of how the accident happened, the second and third cars had stopped short of causing a collision, but when Father Burla hit the third car, he forced it into the second car, and, in turn, that car hit the first. Under the scenario advanced by defendant Burla, the second car hit the first, the third hit the second and only then did the fourth car hit those already involved in the accident. The plaintiff driver testified that there were three jolts, which is consistent with Father Burla's version of the accident. Defendants Burla and the church contend that (1) there should be no restriction on his wearing of a Roman collar, (2) the jury verdict had sufficient support in the record to be reinstated, and (3) there was no basis for the trial judge to conclude that the jury had been prejudiced by knowledge that defendant Burla is a priest. We will combine defendants' first and third issues for our discussion.

I
The first issue in this case relates to the judge's principal ground for granting a new trial. The trial judge determined that as Father Burla was described as a priest and was wearing his Roman collar when he testified, this was too prejudicial to the other parties. He therefore ordered a new trial at which there was to be no mention that Father Burla was a priest, and he would be directed to wear nonclerical garb. If he refused to comply, his testimony at the first trial would be read to the jury.
We disagree with this proposition. We acknowledge that "[a] trial judge has the ultimate responsibility to control the trial in the courtroom and is given wide discretion to do so." Horn v. Village Supermarkets, Inc., 260 N.J. Super. 165, 175, 615 A.2d 663 (App.Div. 1992), certif. denied, 133 N.J. 435, 627 A.2d 1141 (1993). But this responsibility must be exercised reasonably and within *298 constitutional bounds. If a party is a member of the armed services, a firefighter, or a priest, when appearing in court he or she should be entitled to dress in a manner ordinary to him or her. The judge should appropriately charge, as the judge did here, that no undue weight should be given to the testimony of the particular witness by reason of a profession.[1] But a witness should not be artificially dressed by direction of the court.
Whether a trial court has the discretion to prevent a party from appearing in religious attire is a novel issue in New Jersey case law. We first note a February 11, 1991 memorandum from Chief Justice Robert N. Wilentz to the assignment judges, entitled "Courtroom Decorum and Respect for Courtrooms." The memo contained a directive to the trial judges not to restrict litigants from dressing as they choose. The memo stated, in pertinent part:
I do not believe we should try to influence how litigants or witnesses dress, absent something that approaches the obscene. I believe the fact finder, be it the jury or *299 the judge, should see the litigant or witness as that person wishes to appear and reach whatever conclusions flow from that `fact.' If a worker believes that he or she should dress the way he or she always does, I would not stop that; nor would I try to prevent that worker from dressing in a way he or she never does. I realize though this may not be in accord with present practice and welcome your views on it.
The closest New Jersey case deals with a trial judge's restriction of an attorney's attire in the courtroom. In Matter of De Carlo, 141 N.J. Super. 42, 357 A.2d 273 (App.Div. 1976), defendant, a female attorney, was held in contempt of court for disobeying the trial court's order that she dress as he directed. The judge objected to the fact that she wore a sweater and slacks in court. This court reversed the conviction, concluding that the record did not support a contempt finding. We did not determine whether the judge was within his power to restrict defendant's manner of dress, Id. at 46-47, 357 A.2d 273, but we did state that defendant's attire was not the type to be "fairly labeled disruptive, distractive or depreciative of the solemnity of the judicial process...." Id. at 47, 357 A.2d 273.
The issue, however, has appeared elsewhere in three settings: (1) whether there may be religious dress restrictions on attorneys; (2) whether a party or witness may dress, not as a member of the clergy, but in a distinctive manner required by the person's religion, and (3) the precise issue before us, i.e., whether a priest or minister may wear clerical attire when appearing as a party or witness. While New York appears to be the jurisdiction with the most reported cases, the issue has also been discussed elsewhere.
A priest serving as an attorney may be required to wear non-clerical garb, at least where the dictates of his or her religion will not be violated. In La Rocca v. Lane, 77 Misc.2d 123, 353 N.Y.S.2d 867, 872 (Sup.Ct. 1974), rev'd on other grounds, 47 A.D.2d 243, 366 N.Y.S.2d 456, 462 (2d Dept.) aff'd, 37 N.Y.2d 575, 376 N.Y.S.2d 93, 338 N.E.2d 606 (1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 734 (1976), the trial court held that the attorney, who was also a priest, could not wear his clerical collar while he was representing his client during a criminal trial. On appeal, the Court of Appeals agreed and held that

*300 the court of necessity limited defense counsel's right to free exercise of religion in that he was compelled to remove the symbol of his religious calling, a requirement of his calling which is not unconditional or beyond dispensation. The risk that a fair trial could not be had outweighed this incidental limitation.
[376 N.Y.S.2d at 102, 338 N.E.2d at 613.]
However, a different rule was applied to a party where his religious principles required his mode of dress. In Close-It Enters., Inc. v. Mayer Weinberger, 64 A.D.2d 686, 407 N.Y.S.2d 587, 588 (2d Dept. 1978), a New York appellate court reversed a trial court's ruling that defendant could not wear his yarmulke in the courtroom in front of the jury. There, the defendant, after being ordered by the trial judge not to wear his yarmulke in the courtroom, elected to exclude himself from the courtroom rather than remove his skullcap which would have violated a tenet of his religion. Id. The Appellate Division stated that "defendant should not have been placed in the situation of having to choose between protecting his legal interests or violating an essential element of his faith." Id. The court held that the right of the parties to a fair trial did not outweigh defendant's right to free exercise of religion because any potential prejudice that might occur could be guarded against during the jury selection and jury instructions. Id. The court distinguished this case from La Rocca v. Lane, supra.
Similarly, in In re Palmer, 120 R.I. 250, 386 A.2d 1112, 1116 (1978) the trial court had refused to allow the plaintiff to wear his skullcap in the courtroom during the proceedings. Although the facts did not warrant a discussion as to whether the wearing of the skullcap would cause undue prejudice or bias, the Rhode Island Supreme Court applied the balancing test stated in Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 969-970 (1963) and held that "the state would bear a heavy burden of establishing how such actions threaten any compelling interest that the state may have in maintaining decorum in the courtroom." In re Palmer, supra, 386 A.2d at 1116.
Courts have also considered other manners of religious dress. In Joseph v. State of Florida, 642 So.2d 613, 615 (Fla. Dist. Ct. App. *301 1994), the court quashed a trial court's order prohibiting defendant from appearing in court wearing a "sweatshirt and jeans with religious pictures and names." The Court of Appeals found on constitutional grounds that in order for the trial court to have interfered with petitioner's alleged right,
the trial justice should first have allowed petitioner to display the sincerity of his religious belief, and then should have applied the second prong of the Sherbert [v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)] test by balancing the petitioner's first amendment right with the interest of the court in maintaining decorum in its proceedings by regulating dress in the courtroom.
[Id. at 614.]
The court also noted that this was not a case of "questionable religious garb." Id. at 615.[2]
Close-It Enters., Palmer, and the other allegedly obligatory religious dress cases are distinguishable from the case before us, since the original orders impinged on what the parties considered to be a religious obligation, not merely a choice of clothes. A priest, unless required by church law, may wear ordinary garb.
The Second Circuit has briefly directly addressed the issue now before us in O'Reilly v. New York Times, 692 F.2d 863, 869-870 n. 8 (2d Cir.1982). There, the plaintiff was a priest who wanted to represent himself pro se. Id. at 864-865. Although it was not one of the main issues on appeal, the court discussed in a footnote the issue of the plaintiff appearing in his Roman collar. Id. at 869-870. The court distinguished the facts of this case from those of La Rocca v. Lane, supra, in that "Rev. O'Reilly is not a lawyer *302 who happens to be a priest; he is a priest who happens to be a pro se plaintiff...." Id., 353 N.Y.S.2d at 870. The court explained that
any prejudice to [defendant] could be cured by voir dire and jury instructions. It should be enough to explain that Rev. O'Reilly is simply being permitted to wear his everyday dress and that no inference as to his religious standing is to be inferred therefrom.
[Id.]
In People v. Drucker, 100 Misc.2d 91, 418 N.Y.S.2d 744 (Crim. Ct. 1979), the court, stating that it was following Close-It Enters., Inc. v. Weinberger, supra, denied defendant's motion to preclude the complainant, an Episcopalian priest, from testifying in religious dress. The court stated that the potential for bias could be addressed by less intrusive means. Id., 418 N.Y.S.2d at 746-747. The court opined that
[o]ne apparently does not trust the American Jury system if he believes that after an agonizing voir dire and a strong charge, that the jury will be prepared to discount all the evidence, and the myriad factors gleaned from days of testimony, only to decide the case upon the fact that one witness wore a clerical collar.
[People v. Drucker, supra, Id. at 747.]
We see no reason to depart from O'Reilly and Drucker. Any potential bias that could be caused by defendant's religious garb can be and here actually was addressed during the jury selection process and generally should be reiterated during the jury charge. This is a less intrusive alternative than restricting defendant's manner of dress and impinging on his possible constitutional right to free exercise of religion.[3] In the instant case, the judge gave the jury sufficient preliminary information on the subject; the omission of a reiteration in the final charge was, at worst, harmless error.
*303 We, therefore, determine that it was a mistaken exercise of the court's discretion to order a new trial based upon Father Burla's clerical attire and to have required that at any retrial defendant would be prohibited from wearing his clerical attire or from being identified as a priest.

II
The second issue in the case involves whether Father Burla was otherwise improperly found to have been free from liability under the facts of this case, thus warranting a new trial.
A trial court has the discretion, on its own initiative, "to order a new trial for any reason for which it might have granted a new trial on motion of a party." R. 4:49-1(c). The standard of review for such an order by the trial court, whether granted or denied, is as follows: "[t]he trial court's ruling on such a motion will not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1.
In determining whether there was a "miscarriage of justice," we as an appellate court must defer to the trial court with respect to "witness credibility, `demeanor', `feel of the case' or other criteria which are not transmitted by the written record." Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969). However, no special deference need be given to the trial judge with respect to "determination[s] *304 as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record...." Ibid.
N.J.S.A. 39:4-89 provides that
[t]he driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the preceding vehicle and the traffic upon, and condition of, the highway.
Proof of a violation of a statute is not ordinarily conclusive as to the issue of negligence. However, when "a statute specifically incorporates a common-law standard of care, a jury finding of a statutory violation constitutes a finding of negligence." Eaton v. Eaton, 119 N.J. 628, 642-643, 575 A.2d 858 (1990) (citing Dolson v. Anastasia, supra, 55 N.J. at 10, 258 A.2d 706). For example, absent extraordinary circumstances following the car ahead too closely is considered negligence, not merely evidence of negligence. Dolson v. Anastasia, supra, at 10, 258 A.2d 706.
Dolson v. Anastasia, supra, states:
[I]t is elementary that a following car in the same lane of traffic is obligated to maintain a reasonably safe distance behind the car ahead, having due regard to the speed of the preceding vehicle and the traffic upon the condition of the highway. Stackenwalt v. Washburn, 42 N.J. 15, 30 [198 A.2d 454] (1964). Failure to do so resulting in a collision is negligence and a jury should be so instructed.

[Ibid. (emphasis added).]
There is no question that Father Burla was negligent. But the judge, as required by Dolson, properly charged the jury that a violation of N.J.S.A. 39:4-89 "is negligence on the part of that driver." (emphasis added). He could not have been clearer.
The jury, however, did not find Father Burla free of negligence. It found him free of liability. The judge had combined in one jury question the issues of negligence and proximate cause. The jury found that the combination of Father Burla's negligence and proximate cause was "0%."
There were adequate facts in the record to support this conclusion. The driver of the third car, Ms. Fields, contended that she was hit so hard from the rear that her head was forced into the windshield, with sufficient force to crack it. The jury could have determined that Ms. Fields must have been mistaken. Physically, if a car is hit from behind, a person's head is thrown *305 backward, not forward. Crispin v. Volkswagenwerk AG, 248 N.J. Super. 540, 547, 551, 591 A.2d 966 (App.Div.), certif. den., 126 N.J. 385, 599 A.2d 162 (1991). Of course, it is possible that the driver of the third car had her head first thrown backward, and then when she hit the car ahead of her, her head was thrown forward into the windshield. But this does not reflect her testimony or the physical facts. Although her initial testimony is ambiguous as to when her head snapped forward, she clearly agreed on cross-examination that the impact to her car was so hard that her head struck the windshield of her vehicle. She acknowledged, however, that the damage to the rear of her car was merely a broken right taillight. She testified that she had stopped without having struck the car in front of her and then was hit in the rear by Father Burla. Nevertheless, a jury certainly could have believed that the physical evidence showed a light impact to the rear of her vehicle that was unlikely to have propelled her car so strongly that there was a severe impact to the front of her vehicle. The impact not only caused her to break the windshield with her head, but also to smash the front end of her car and the rear of the Krass vehicle.
From the slight damage to the rear of the Fields car and front of the Burla car, the substantial damage to the front of the Fields car, and Ms. Fields having been thrown forward against her windshield, the jury could properly have found that the Burla car's impact was after the brunt of the collision occurred. Thus, the jury could properly have found that Father Burla's actions were not a proximate cause since they were not a substantial factor in the happening of plaintiffs' accident. 2175 Lemoine Avenue Corp. v. Finco, Inc., 272 N.J. Super. 478, 487, 640 A.2d 346 (App.Div. 1994) (citing State v. Jersey Central Power & Light Co., 69 N.J. 102, 110, 351 A.2d 337 (1976)). There thus was no "miscarriage of justice under the law" warranting the trial judge to grant a new trial sua sponte. R. 4:49-1; 2:10-1.
Since we find that there was no basis to upset the verdict returned by the jury, it should be reinstated in full. The order appealed from is therefore reversed in all respects.
NOTES
[1] The judge told one juror (in the presence of all):

I've got to tell you something, that there's no aristocracy in this country. And whether you wear a  as I say, a blue police uniform, a white medical lab coat, or even a black judicial robe or white collar doesn't entitle you to one bit of presumption that you're telling the truth more than anybody else.
He also preliminarily inquired of the jury as a whole:
[F]olks, one of the parties, as I indicated to you, is a  is a priest, rabbi or minister. In this case, I think it's a priest. And what I want to know is, has your experience in the  and I'm not going to ask you  I have no right to ask you what your religious preferences are or anything else like that.
But have your experiences in the past  let's say three or four years been such that you would tend to be either overly fair or antagonistic to a person of the cloth? Would there be a feeling on your part that you would clothe that person with a presumption of being incapable of telling a lie, or would that  would you have an attitude that that person probably was incapable to telling [sic] the truth?
I mean, I don't care which side it falls on, but if it falls on either side, would you feel uncomfortable and have a tendency to feel that you would be biased either too much in favor or too much against a person who was a member of the cloth who came up here to testify? Would that create problems for any of you in calling this case fairly for all of the attorneys involved and all of their clients involved? Anybody got a problem with that Great, okay.
[2] For such a case of questionable religious garb, see, State v. Hodges, 695 S.W.2d 171 (Tenn. 1985), where this principle was extended to the extreme. In Hodges, the Tennessee Supreme Court affirmed the appellate court's decision requiring the trial court to inquire into the religious belief of a defendant who insisted upon appearing in court "dressed like a chicken" before prohibiting defendant from doing so. The court stated that

[i]f the trial court feels the need to instruct the jurors or venire persons to disregard such religious dress in performing their duties and to explain petitioner's right, such instruction would be consistent with the First Amendment and the trial court's control of the courtroom.
[Ibid.]
[3] Since there is a non-constitutional basis for determining this case, we need not decide the constitutional questions posed by defendants Burla and the Church. We merely note the First Amendment of the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting establishment of religion, or prohibiting the free exercise thereof." The First Amendment has been applied to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "[The First Amendment] applies to the judiciary as well as the executive and legislative branches of government." In re Adoption of E., 59 N.J. 36, 51, 279 A.2d 785 (1971). The current standard in determining whether an individual's First Amendment right to free exercise of religion is violated is set forth in Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963) and recently reiterated in 42 U.S.C.A. § 2000bb, The Religious Freedom Restoration Act ("RFRA"). RFRA states:

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person 
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
[42 U.S.C.A. § 2000bb(1)(b).]