# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0577-22

L.H.,

    Plaintiff-Respondent,

v.

P.H.,

    Defendant-Appellant.

_____

        Submitted February 26, 2024 – Decided April 3, 2024

        Before Judges Gilson and Berdote Byrne.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FV-01-0228-23.

        Jeff Sheppard, attorney for appellant.

        Mark E. Roddy, attorney for respondent.

PER CURIAM

Defendant, P.H. ("Peter"),[1] appeals from an October 7, 2022 final restraining order (FRO) entered in favor of his adult sister, plaintiff L.H. ("Lisa"), pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25–17 to –35.  Peter obtained a cross-temporary restraining order against Lisa based upon the same incident that gave rise to the FRO before us on review.  Additionally, two of Peter's other adult sisters obtained their own temporary restraining orders (TROs) against him regarding different incidents that took place at differing times.

Peter represented himself at trial and testified with the aid of a court-appointed interpreter.  The trial court consolidated all four TRO hearings, denied Peter a FRO against Lisa, found Peter had committed the predicate act of harassment against Lisa, and found an FRO was necessary to protect Lisa from further harassment.  The trial court dismissed the remaining two TROs obtained by the other sisters, but then added those two sisters as additional protected parties to Lisa's FRO.  It also added plaintiff's husband ("Andy"), the husband of one of the other sisters, and plaintiff's nineteen-year-old nephew (the third sister is unmarried).

---

[1]  We use initials and pseudonyms in this domestic violence case to protect the identities of the parties.  R. 1:38-3(b)(12).

A-0577-22

We conclude the trial court failed to follow the guidance required by State v. Juracan-Juracan, 255 N.J. 241 (2023), and the New Jersey Judiciary's Language Access Plan (LAP) regarding the court's obligation to ensure a clear interpretation and narration of the proceedings. Further, we conclude there is insufficient evidence to support a finding Peter purposefully harassed Lisa, and insufficient evidence to support the trial court's finding a FRO is necessary to prevent imminent risk of future harm to Lisa pursuant to Silver v. Silver.

Additionally, we conclude there is insufficient support in the record regarding the addition of plaintiff's two sisters, her husband, her brother-in-law, and her adult nephew as protected third-parties pursuant to N.J.S.A. 2C:25-29(b)(7). We vacate the FRO.

## I.

We glean the following facts from the record: the parties are adult siblings who have not resided together since 1985, when Peter — then fourteen years old — lived in Vietnam with his siblings. The parties testified their relationship became contentious following their father's death in 2020, due to disagreements regarding the distribution of their father's estate in Vietnam.

On August 10, 2022, Peter encountered his brother-in-law, Andy, by chance at a big box store and began arguing with him about familial matters.

Andy telephoned Lisa, who arrived at the store five minutes later and began arguing with Peter. Peter claimed both Lisa and Andy hit him, chased him, and threatened him, stating if he went back to Vietnam Andy would hire a person to murder him.

Lisa testified that while she was shopping at a nearby store, Peter confronted Andy verbally at the big box store. Andy telephoned her to tell her about the incident. Lisa immediately went to the store, and, upon her arrival, she approached Peter and asked him if he was "born from the dog." Their argument followed.

Lisa provided the court with two video clips taken from the big box store's surveillance recording of the incident.[2] The recordings were played for the court but not narrated into the record.[3] According to the accompanying testimony, the videos purportedly show Peter approaching Andy and yelling at him. Peter puts his finger in Andy's face and swipes his hand near his face. Afterwards, Andy made a phone call, presumably to Lisa. Minutes later, Lisa walked into the store and confronted Peter, at which point they argued. Peter moved towards Lisa.

---

[2] Neither video clip was provided as a part of the record on appeal.

[3] It is unclear from the record whether any sound accompanied the recording.

A-0577-22

In response, Lisa pushed him, and Andy intervened and separated the siblings by pushing Peter away. Peter continued to argue, put his finger in Lisa's face after being separated, and Lisa poked him. The police were called, and the parties left the store peacefully.

After this incident, both Peter and Lisa obtained cross-TROs against the other. Lisa's TRO claimed Peter harassed her, Andy, and the two sisters. Peter's TRO alleged Lisa and Andy harassed him[4] and made terroristic threats against him. The nineteen-year-old nephew was not mentioned in any complaint or in any testimony at trial. The parties' other two sisters obtained individual TROs against Peter regarding separate verbal allegations, also alleging harassment,[5] but arising out of the same familial conflict over their father's estate. The husband of one of the sisters was mentioned in passing in that sister's FRO testimony but was not mentioned in Lisa's complaint or during her testimony.

Lisa testified that on two prior unspecified dates, Peter showed up at her job at the Tropicana Casino uninvited (Peter works nearby at the Borgata). He appeared angry, accused her of attempting to "screw" him out of money, and paced back and forth in her work section. These allegations were not included

---

[4] Peter's TRO is not before us and not part of the record on appeal.

[5] Those TROs are not before us and not part of the record on appeal.

A-0577-22

in the TRO, although the TRO states Peter and the two other sisters "all work together at the same casino. [Lisa] works at a different casino." Lisa admitted she did not call security on those two unspecified dates. She testified no incidents occurred after the big box store confrontation, except Peter cursed at her at the courthouse, calling her a "son of a bitch" and threatening to handcuff her and their two other brothers to put them in jail.

At trial, the court heard Peter's application for a final restraining order against Lisa first. The record has numerous instances where the transcript is indiscernible. During his cross-examination the court viewed the two video clips of surveillance footage from the big box store, introduced by Lisa's counsel. Lisa's counsel did not attempt to authenticate the video or address how the clips came into his possession. Her counsel did not attempt to move the video clips into evidence, but merely played them in court. There was no narration of the videos, and it is unclear whether the clips contained sound.

At the end of his testimony, Peter asked that the police report be entered into evidence but there was no ruling on the record as to whether the police report was admitted.

Lisa testified in opposition to the entry of a final restraining order against her. Although Lisa testified she had previously viewed the two video clips at

her counsel's office, Peter had not been provided with either video clip. After Lisa's testimony ended, the court concluded Lisa was credible and Peter was not credible because his testimony was belied by the video. The court found:

> The video tape completely disproves his testimony. . . . [Peter] approached the husband. He put his finger in the husband's face. There's no question in the Court's mind that [Peter] was the aggressor. . . . At that point, [Andy] called someone, which – which we know from the testimony was [Lisa]. . . . The second clip showed [Peter] putting his hands on [Lisa] first. She pushed him back. He went at her. Her husband had to intervene and push him back. After that he put - - [Peter] put his finger in – in her face and – and [Lisa] essentially pokes at him at that point and he kept pointing at her.
> . . . . essentially, he's an antagonist, an instigator. He showed no fear in the video and -- and disdain here today. So, the Court doesn't find him to be credible.
>
> . . . .
>
> The Court finds that on or about August 10th. . . [Peter] approached [Lisa's] husband, yelled at him, put his finger in his face, he was aggressive, swiped near his face, seemed to put his hand on him. . . you saw the husband call someone, he was calling [Lisa].
>
> She was at the Asian Market. She came, she walked in, She asked [Peter,] "Why?" Which appeared to be consistent with the video. And he called her stupid. . . . He was angry. . . . And, again, he was the agitator and the instigator.
>
> . . . .

A-0577-22

> Here there is no purpose to harass by [Lisa] at all. She wasn't even at [the store]. She in no way precipitated the incident. She wasn't the agitator or the instigator. She went there because there was an incident and her purpose was basically with her husband to get away from [Peter].

After dismissing Peter's TRO, Lisa was recalled as a witness in her FRO hearing, but only to provide testimony with respect to Peter's alleged prior acts of harassment. In other words, the court allowed Lisa's counsel to incorporate all of Lisa's testimony from the prior hearing. Lisa testified as to incidents at the Tropicana not mentioned in her TRO. After she testified as to these undated incidents, the following colloquy ensued:

> Court: Okay. And how many times did that happen?
>
> [Lisa]: I don't know exactly, maybe two times.
>
> Court: Would you feel safer if the [c]ourt issued an order telling him to stay away from you?
>
> [Lisa]: Yes.

The trial court found the parties were household members at one time, pursuant to N.J.S.A. 2C:25-19(d), because the parties resided in the same home as children in Vietnam. After making credibility determinations, the trial court concluded Peter harassed Lisa in violation of N.J.S.A. 2C:33-4. Relying on the videos, it found Peter approached Andy, appeared to yell at him, put his finger

8

in Andy's face, swiped near his face, and put his hands on him. Andy called his wife, and Lisa came to the store. The court observed Peter's conduct and found he was the aggressor at all times. It concluded Peter's actions constituted harassment in violation of N.J.S.A. 2C:33-4(a) and (b) because his aggressive actions, first towards Andy, and then to Lisa, as shown in the videos, and the testimonies at trial "clearly evidence[d] a purpose to harass." It determined Peter made a communication "in offensively coarse language,"[6] by calling Lisa "stupid," during the verbal altercation and he subjected her to "offensive touching,"[7] by placing his hand on her during the same event.

The trial court then considered whether an FRO was necessary to protect Lisa from the threat of future violence or prevent further harassment. It found Peter went to Lisa's job on two undated occasions, accused her of "trying to screw him," in reference to their dispute regarding the estate, and called her names. It also found the existence of risk of future harm because of the dispute over the estate, and concluded a FRO would be in Lisa's "best interest."

The court entered the FRO in favor of Lisa and included her husband Andy, her two sisters, her brother-in-law, and her nineteen-year-old nephew as

---

[6] N.J.S.A. 2C:33-4(a)

[7] N.J.S.A. 2C:33-4(b)

protected third parties. It reasoned including those individuals was "the fair and just thing to do" without further explanation. The court then dismissed both sisters' TROs. This appeal followed.

## II.

Our review of a FRO is generally limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). In matters involving domestic violence, the Supreme Court has held the findings of a trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).

Our review of questions of law "are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles." R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215-16 (App. Div. 2015)); see also H.E.S. v. J.C.S., 175 N.J. 309, 329-31 (2003) (remanding to the trial court because it failed to "consider the totality of the circumstances surrounding the complaint . . . ."); D.M.R. v. M.K.G., 467 N.J. Super. 308, 325 (App. Div. 2021) (reversing the trial court's entry of a FRO due to lack of findings, no prior history of domestic abuse existing between the parties, and plaintiff's lack of fear). We review conclusions of law de novo. C.C., 463 N.J. Super. at 428.

When determining whether to issue a FRO pursuant to the PDVA, a trial court must make two distinct determinations. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125.

If a court finds a predicate act occurred pursuant to N.J.S.A. 2C:25-19(a), "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322; Silver, 387 N.J. Super. at 126-27. "Although this second determination—whether a domestic violence restraining order should be issued—is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. N.J.S.A. 2C:25-29(a) provides "[t]he court shall consider but not be limited to" six factors, including the previous history of domestic violence between the parties. "[W]hether the victim fears the defendant" is an additional factor the trial court may consider. G.M. v. C.V., 453 N.J. Super. 1, 13 (App. Div. 2018) (quoting Carfagno v.

11

Carfagno, 288 N.J. Super. 424, 435 (Ch. Div. 1995)). The court must determine, pursuant to the totality of the circumstances, whether the FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127; C.C., 463 N.J. Super. at 436; see also N.J.S.A. 2C:25-29(b) (explaining "the court shall grant any relief necessary to prevent further abuse"). The inquiry is necessarily fact specific. Silver, 387 N.J. Super. at 127-28 (remanding for further fact finding).

    1. The Transcript of the Hearings and Court-Provided Interpretation.

As an initial matter, the trial court erred in failing to ensure an accurate interpretation of the record. "A trial judge has broad discretion in controlling the courtroom and court proceedings." State v. Juracan-Juracan, 255 N.J. 241, 250 (2023); Ryslik v. Krass, 279 N.J. Super. 293, 297 (App. Div. 1995). However, a court has a duty to "prevent conduct which may improperly impact on the trial process . . ." State v. Castoran, 325 N.J. Super. 280, 285 (App. Div. 1999).

In State v. Juracan-Juracan, 255 N.J. 255, 241 (2023), our Supreme Court recognized the "New Jersey Judiciary Language Access Plan" (LAP), in conjunction with case law and rules, provides our courts with guidance on language access services for judicial proceedings. Standard 1.2 of the LAP

provides "[a]n interpreter shall be provided to any court user when either that court user or that court user's attorney represents that the person is unable to understand or communicate proficiently in English." See Admin. Off. of the Cts., Admin. Directive #10-22, New Jersey Judiciary Language Access Plan (Sep. 30, 2022); see also Daoud v. Mohommad, 402 N.J. Super. 57 (App. Div. 2008) (recognizing guidance provided in Administrative Directive #3-04, an earlier equivalent of the LAP, and finding interpreters are to be used when failure to do so could negatively impact a litigant's rights).

The LAP specifies that a trial judge "should ensure that the person with limited proficiency in English [(LEP)] . . . is addressed in his . . . own language only by the official interpreter." Directive #10-22, at 47. "Judges should also ensure a clear record," such as ensuring "all examinations of LEP persons are interpreted consecutively to ensure a clear record. In consecutive interpreting, the speaker must pause for the interpretation to be put on the record. Other phases of the proceeding are interpreted simultaneously with no pauses for the interpretation." Ibid.

Our review of the transcript reveals its inadequacy because an extensive amount of the trial is largely indiscernible, particularly Peter's testimony. Additionally, there are several instances of persons talking over each other and

at the same time — simultaneous speech.  However, in <u>State v. Izaguirre</u>, 272 N.J. Super. 51, 56 (App. Div. 1994) we noted "[t]he absence of a verbatim record does not render a trial unfair; it merely raises a question concerning fairness that must be addressed."  Here, however, there is an insufficient record for us to evaluate all the testimony.

2.    <u>The Predicate Finding of Harassment against Peter</u>.

The court found Lisa had proven, by a preponderance of the credible evidence, Peter harassed her at the big box store.  That finding is not supported by the record.

With respect to the predicate act of harassment, N.J.S.A. 2C:33-4 requires the perpetrator act "with [the] purpose to harass another."  Such a finding "may be inferred from the evidence presented" and "[c]ommon sense and experience may inform that determination."  <u>State v. Hoffman</u>, 149 N.J. 564, 577 (1997).  It may also be inferred from the parties' history.  <u>J.D. v. M.D.F.</u>, 207 N.J. 458, 487 (2011).

The court erred in considering Peter's conduct toward Andy as supportive of the predicate act of harassment.  Peter's actions towards Andy cannot establish the predicate act of harassment to Lisa.  As a civil action, the PDVA's remedies, including a FRO, are limited to the parties to the proceeding; the act protects

14

only victims of domestic violence against domestic abusers.  See N.J.S.A. 2C:25-18; N.J.S.A. 2C:25-19(a) (defining "[d]omestic violence" as the occurrence of one or more enumerated criminal offences "inflicted upon a person protected under this act"); M.A. v. E.A., 388 N.J. Super. 612, 619-20 (App. Div. 2006) (limiting the predicate act of harassment to acts against the plaintiff in the context of the PDVA).  If the party does not qualify as a "victim of domestic violence" under the PDVA, he or she cannot seek relief under the act.  J.D., 207 N.J. at 473.  If the predicate act complained of affects a third party and not the qualifying alleged victim, it cannot serve as a basis for relief under the PDVA.  See M.A., 388 N.J. Super. at 619 (finding that harassment, for purposes of the PDVA, "logically refers to the plaintiff, and not a third party"); N.J.S.A. 2C:25-19(a).

The record demonstrates Peter did not seek Lisa out to harass her; in fact, as noted by the trial court, Lisa was not present until Andy summoned her to the store.  Despite this, the court found Peter committed the predicate act of harassment against Lisa because he instigated a verbal dispute with Andy, There is no evidence Peter acted with a purpose to harass Lisa.

When we focus exclusively on the evidence of Peter's interactions with Lisa, the record cannot support a finding of harassment.  Lisa voluntarily came

to the store to confront Peter after Andy summoned her. She instigated the verbal altercation with Peter by asking him if he was a "dog." And, the trial court's findings that Peter subjected Lisa to "offensive touching," by "put his hands on her first," and she pushed and poked him only in self-defense are also not supported by the record.

After the video clips were played in court, Lisa's counsel asked her: "Did you push him, or did he push you? What happened, because that part's not clear [on the video]?" Lisa admitted Peter did not touch her, responding: "Well, I felt that he move[d] toward me so that he would touch me or push me, I'm not exactly sure. So, automatic [sic], I put my hand out and pushed him back to make sure that he didn't hit me." In his closing statement on Peter's FRO hearing, Lisa's counsel again conceded the video clips did not show Peter touched Lisa when he stated: "It's unclear who's pushing who, but the husband separates the two because he doesn't like what might happen. I don't think there is proof even by a preponderance of the evidence that there's any kind of assault whatsoever."

Lisa never testified that Peter touched her. Her counsel admitted Peter did not touch her on two occasions. The sum of Lisa's testimony and video evidence demonstrates she came to the store to confront Peter, she proactively pushed

16

Peter and poked him, and Andy pushed Peter away from her, but Peter never touched Lisa.  Against this factual basis, the court's finding that Peter "put his hands on her first" and "subjected her to unwanted touching" is not supported by the facts in the record.

The trial court's finding that Peter "made communication in offensively coarse language," pursuant to N.J.S.A. 2C:33-4(a), by calling plaintiff stupid was also a legal error.  Calling another person stupid in a verbal altercation, without evidence of a pattern, is not coarse language as contemplated by the statute, particularly in response to being asked whether you are "born from a dog."  Compare Corrente v. Corrente, 281 N.J. Super. 243, 250 (App.Div.1995) (holding defendant's threat of using "drastic measures" during an argument with his separated wife and defendant's causing the telephone service at his wife's home to be shut off fell short of the domestic violence statutory standard), and E.M.B. v. R.F.B., 419 N.J. Super. 177, 183 (App. Div. 2011) (holding defendant's statement "senile old bitch" was "understandably upsetting" language, but it was insufficient to establish a purpose to harass); Peranio v. Peranio, 280 N.J. Super. 47, 55 (App. Div. 1995) (holding defendant's statement "I'll bury you" to plaintiff insufficient as a matter of law to meet the statutory standard for domestic violence), with State v. Fin. Am. Corp., 182 N.J. Super.

17

33, 41 (App. Div. 1981) (holding a racial epithet was "offensively coarse" language), and Roe v. Roe, 253 N.J. Super. 418, 422-23 (App. Div. 1992) (holding defendant's threat during a heated argument to kill or have plaintiff's spouse killed sufficient to constitute an act of domestic violence). Not every offensive or rude behavior rises to the level of harassment. J.D., 207 N.J. at 483. The record evidence does not support a finding defendant called his sister "stupid" with the intent to annoy her, in violation of subsection (a). See State v. L.C., 283 N.J. 441, 448, 450 (App. Div. 1995).

From our review of the evidence, the governing statutes, and controlling case law, we conclude there is insufficient, credible evidence in the record to establish Peter harassed Lisa on August 10, 2022.

Because there is insufficient support for the finding of the predicate act, we need not determine whether a FRO should issue pursuant to the second prong of Silver.

3. Additional Protected Parties.

N.J.S.A. 2C:25-29(b) authorizes the court to order restraints on various forms of conduct and interactions with a victim. Therefore, a trial court has discretion to "grant any relief necessary to prevent further abuse."

Although the trial court's discretion is broad, it is not limitless, and, at minimum, it requires the court to make a specific factual finding as to why an additional person is a protected party covered under a FRO. The PDVA already prohibits a defendant from contacting a plaintiff through any intermediary third party. N.J.S.A. 2C:25-29(b)(7). Therefore, the inclusion of an additional protected party in an FRO must be based on a factual finding that interaction between that third party and the defendant is likely to cause a risk of future harm to the victim. See J.D., 207 N.J. at 488 (holding the trial court failed to "sufficiently articulate findings and conclusions consistent with the statutory standards.") Additional protected parties should be added to a FRO only if the trial court is able to articulate a risk to the victim, based upon the specific facts and circumstances of the case.

Here, the trial court did not provide sufficient findings of fact to support its decision to add Andy, Lisa's two sisters, her brother-in-law, and her nineteen-year-old nephew as additional protected parties. See R. 1:7-4(a). The court stated it was granting Lisa's request for a final restraining order and designating the family members as protected parties "because [it] believe[d] . . . it[] [was] the fair and just thing to do" despite dismissing the other two sisters' complaints.

Reversed. The Final Restraining Order is vacated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-0577-22