101 P.3d 652

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Harry FERGERSTROM, Defendant–Appellant.**

No. 25579.

Intermediate Court of Appeals of Hawai'i.

Oct. 8, 2004.

Certiorari Granted Nov. 15, 2004.

Darien W.L. Ching Nagata and Michael J. Udovic, Deputy Prosecuting Attorneys, County of Hawaii, on the briefs, for Plaintiff–Appellee.

Steven D. Strauss, on the briefs, for Defendant–Appellant.

BURNS, C.J., FOLEY and NAKAMURA, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Harry Fergerstrom (Fergerstrom) appeals from the December 13, 2002 Judgment entered in the Circuit Court of the Third Circuit by Judge Greg K. Nakamura. We affirm.

## I.

### THE COMPLAINT

The complaint filed on May 21, 2002 by the Plaintiff–Appellee State of Hawai'i (the

State) charged that, on February 9, 2002, Fergerstrom violated the following laws:

Count I: Driving Without a License, Hawaii Revised Statutes (HRS) § 286-102(a) (1993); [1]

Count II: Operation of a Vehicle Without a Certificate of Inspection, HRS § 286-25 (1993); [2]

Count III: Delinquent Motor Vehicle Tax, HRS § 249-11 (1993); [3] and

Count IV: Conditions of Operation and Registration of Motor Vehicles, HRS § 431:10C-104(a) (Supp.2003). [4]

## II.

### PRE-TRIAL

On September 5, 2002, Fergerstrom filed "Defendant Harry Fergerstrom's Motion to Dismiss (First Amendment)" in which he argued, in relevant part, as follows:

7. Mr. Fergerstrom believes that to comply with these State regulations would compel him to recognize the legitimacy of the State of Hawai'i as a political entity, which he considers himself unable to do so long as the federal government refuses to recognize Hawaiian political sovereignty.

8. Mr. Fergerstrom's acts of political protests are protected under the First Amendment to the United States Constitution.

9. There is no reasonably available lawful alternative to Mr. Fergerstrom's acts of political protests, which are responsive to an immediate, present and continuing threat to his Hawai'ian [sic] political sovereignty and which are designed to provide direct, legal challenge to the United States' continuing unlawful refusal to recognize Hawaiian political sovereignty.

On September 13, 2002, Fergerstrom filed a "Declaration of Harry Fergerstrom" in which he declared, in relevant part, as follows:

2. For 30 years, I have protested the United States' [sic] federal government's failure to recognize the political sovereignty of native Hawaiians in a variety of ways, including public demonstration, participation in education and outreach efforts to restore the constitutional monarchy of the Kingdom of Hawai'i, and acts of refusal to accept the legitimacy of the institutions established by the United States' [sic] fed-

1. Hawaii Revised Statutes (HRS) § 286-102(a) (1993) states as follows:

> **Licensing.** (a) No person, except one exempted under section 286-105, one who holds an instruction permit under section 286-110, one who holds a commercial driver's license issued under section 286-239, or a commercial driver's license instruction permit issued under section 286-236, shall operate any category of motor vehicles listed in this section without first being appropriately examined and duly licensed as a qualified driver of that category of motor vehicles.

2. HRS § 286-25 (1993) states as follows:

> **Operation of a vehicle without a certificate of inspection.** Whoever operates, permits the operation of, causes to be operated, or parks any vehicle on a public highway without a current official certificate of inspection, issued under section 286-26, shall be fined not more than $100.

3. HRS § 249-11 (1993) states as follows:

> **Fraudulent use of plates, tags, or emblems and other misdemeanors; penalties.** Any person who manufactures, sells, or distributes vehicle number plates, tags, or emblems of a design and size similar to the currently issued series of number plates, tags, or emblems au-

thorized by the director of finance, or who attaches to and uses on any vehicle plates, tags, or emblems not furnished in accordance with sections 249-1 to 249-13 or 286-53, or who fraudulently uses such number plates, tags, or emblems upon any vehicle other than the one for which the number plates, tags, or emblems were issued, or who molests or disturbs any vehicle which has been seized pursuant to sections 249-1 to 249-13, or any person who knowingly uses a motor vehicle, the tax upon which is delinquent, upon public highways of this State, or any director of finance who issues a certificate of registration or number plates, tags, or emblems to any person who has not paid the tax required by sections 249-1 to 249-13, or any person who violates any of the provisions of such sections, shall be fined not more than $500.

4. HRS § 431:10C-104(a) (Supp.2003) states as follows:

> **Conditions of operation and registration of motor vehicles.** (a) Except as provided in section 431:10C-105, no person shall operate or use a motor vehicle upon any public street, road, or highway of this State at any time unless such motor vehicle is insured at all times under a motor vehicle insurance policy.

eral government in Hawai'i, including establishment and maintenance of the State of Hawai'i. My commitment to acts of protest continued and strengthened after the apology resolution, U.S. Public Law 103–150.

3. I have declined to obtain a driver's license from the State of Hawai'i because the State is a political sub-entity of the United States federal government, which does not recognize the political sovereignty of Hawaiians. My refusal to obtain a license, pay a weight tax and safety inspection for vehicles I drive and my decision not to obtain State-mandated no-fault insurance are purely acts of political protest compelled by my religion. I am *hiapo no koa o Pu'u Kohola Heiau*, a spiritual warrior dedicated to the restoration of the Hawaiian Kingdom. I sincerely continue my religious practice which requires that I make *pono* [right][5] the illegalities of the past.

4. I chose these forms of protest because they would cause no harm to anyone. I believe that to comply with these State regulations would compel me to recognize the legitimacy of the State of Hawai'i as a political entity, which I am unable to do so long as the federal government refuses to recognize Hawaiian political sovereignty. I chose to do these acts instead of trespass or more violent acts because the public is not harmed. My acts of political protests are protected under the First Amendment to the United States Constitution. Accordingly, I request that this Court dismiss the charges against me on the basis of my First Amendment rights.

(Footnote added.)

On September 13, 2002, Fergerstrom filed a "Motion to Dismiss Based on Gross Violations of the 14th Amendment of the U.S. Constitution." In Fergerstrom's words, the right violated was "[t]he right to equal protection under the law."

Fergerstrom's two pre-trial motions were heard on September 30, 2002 and October 1, 2002, and immediately prior to the com-

mencement of the jury trial on October 7, 2002, the court entertained three motions in limine.

At the September 30, 2002 pre-trial hearing, the court heard the testimony of Eleanor Ahuna (Ahuna), Keoni Choy (Choy), and Fergerstrom. Ahuna testified, in relevant part, as follows:

THE COURT: Do you personally recognize Mr. Fergerstrom as a hiapo na koa [first born warrior][6]?

THE WITNESS: Yes, I do.

THE COURT: You do? Okay. You said that in order to become a hiapo na koa, he had to take an oath?

THE WITNESS: Yes, ... he had to take an oath ... with the group of people that were authorized to hold their authority to allow him to be a na koa, a hiapo na koa.

. . . .

THE COURT: ... [I]s it your view that ... someone who holds your religious beliefs ... must drive without a license issued by the State of Hawaii?

. . . .

THE WITNESS: No, I don't think it's a must drive [sic] without a license. It's ... just that ... along with the, uh, na koa oath, they were given the freedom ... to live according to the Hawaiian way, which was trying to get the Hawaiian kingdom back, trying to get their freedom back, which would mean that they would try their best to abide by what was before, uh, not having to have a license and not having to abide by the laws that were made after the kingdom was overthrown.

. . . .

THE COURT: ... [M]y question had been what is your personal view about driving without a license

. . . .

THE WITNESS: I wouldn't do it but [Fergerstrom] is a different person.

. . . .

5. This definition of the Hawaiian word comes from Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 340 (rev. ed.1986).

6. Pukui & Elbert, *supra*, at 67, 156.

Q. Kupuna [a grandparent or a person of the grandparent's generation] [7], in—in determining whether something is pono for an individual, is that accomplished through prayer and through a determination for oneself or is that something that is determined consistent with what other people have taught or what other people have said?

A. E ho'o pono pono, the—the matter that needs to be resolved, uh, needs to be resolved by that person with the people. And if they cannot agree, there has to be a time to get together to see what is wrong there. What is wrong. And when a person has his own, uh, creed to live by and—and he refuses to agree, e ho'oponopono, as long as it's pono, we need to agree to what he's saying.

. . . .

A. What's happening is . . . the American law says that he has to have that license, and in his law that he lives by says no. In order to be pono, it is his kuleana [right or privilege] [8] to make a decision and if he chooses not to do it, he . . . has to live by that.

. . . .

Q. Kupuna, are you familiar with the dress that Mr. Fergerstrom has on?

A. 'Ae, yes.

Q. And do you know what occasion such dress is worn for?

A. In . . . events where occasions where great, uh, decisions are made, this is the garments of the na koa that they stand up in judgment or in . . . preparing for anything that is pono. And this is something that they wear [because] this is to show your manhood, uh, the way that the Hawaiian people would dress was just the malo [a male's loincloth] [9] and the kikepa [a tapa or sarong worn by women under one arm and over the shoulder of the opposite arm][.] [10]

That's all they wore. But . . . to put on that, uh, drape there . . . is a sign of respect to be in the presence of others that are higher than he is. Unless he comes as a warrior, he doesn't have to do that. He can come with only his malo.

(Footnotes added.)

Choy testified, in relevant part, as follows:

Q. Now, . . . do you understand what the obligations, if any, of a hiapo na koa are?

A. 'Ae.

Q. What are those obligations?

A. . . . [A] na koa is to protect and perpetuate . . . the culture.

Q. And how are those obligations accomplished?

A. Through actions to either challenge or to educate. To bring forward, uh, knowledge. To—to make sure that, uh, in case something happens to—for them to go in the lead and they have to form the way.

. . . .

Q. Do you yourself have a driver's license?

A. Yes, I do.

Q. . . . [A]ssume for the moment that Mr. Fergerstrom considers that he is spiritually and politically precluded from having or carrying a driver's license. That is something that he cannot do and be pono. How can you reconcile that with your own practice . . . ?

. . . .

THE WITNESS: A. As—as a hiapo, he's the point. He has to go out there first. It is his duty. He is also protecting us by being out there first.

. . . .

Q. How—how does it come that Mr. Fergerstrom is out in front?

A. Well, . . . actually he's ordered out under the direction of an ali'i [royalty or chief, male or female] [11] to take point. Ac-

7. Pukui & Elbert, *supra,* at 186.

8. Pukui & Elbert, *supra,* at 179.

9. Pukui & Elbert, *supra,* at 233.

10. Pukui & Elbert, *supra,* at 149. The record does not reveal why Fergerstrom was wearing a *"kikepa"* rather than a *"kihei"*. *See* note 15 infra.

11. Pukui & Elbert, *supra,* at 20.

tually it's more than one ali'i. There's, uh, many of them he is taking direction from.

My orders are not to get arrested and not to do exactly the same challenges; that I am supposed to be the next wave.

. . . .

A. . The duty of a na koa is to follow the orders of an ali'i.

. . . .

Q. You have any choice about whether to follow those?

A. Absolutely not.

Q. And do you know why there are different challenges for different individuals?

A. They don't always tell us, uh, the reasons why that the ali'is have. . . .

Q. And do you know what the consequences are, if any, for a na koa not to follow or not to follow through on a challenge or accept a challenge?

A. Death.

Q. By what agent? How does death occur?

A. By an order from the ali'i. And if he was to be excluded from the ali'i like an outcast or something, we would be not able to survive.

Even if he were not directly killed, you could not survive by your own without any help from your ohana and the ali'is.

Q. So casting out . . . has the same concept as death?

A. Same as death, yes.

(Footnote added.)

At the October 1, 2002 hearing, Fergerstrom testified, in relevant part, as follows:

Q. And what religion are you a practitioner of?

A. Of native Hawaiian religion. The overall native Hawaiian religion, and very specifically the Lono traditions.

. . . .

Q. . . . . [C]an you explain to the Court the relationship between your sense of religious practice and duty and your sense of political duty?

A. I can probably, um, clarify it this way. It is very difficult to separate the Hawaiian from his land, his religion, or the politics that engulf him.

Q. Have you engaged in acts of, what would be termed in western concept, political protest?

A. Yes, sir.

Q. Do you . . . see those acts of political protest as inseparable from religious conduct?

A. Yes, sir.

. . . .

Q. . . . . Have you ever had a State of Hawaii driver's license?

A. Yes.

Q. And when did you stop having a license or stop renewing it?

A. In 1993—in November of 1993 United States public 103–150 was signed by the president of the United States on behalf of all people of the United States recognizing the involvement of the United States in the conspiracy and the subsequent invasion of the Hawaiian islands. Creating what is internationally recognized as a military occupation.

. . . .

Q. . . . . [H]ow would having a driver's license personally interfere with your— your path? Your understanding of your religious duty, your understanding of your political duty, the mixture of the two?

A. When you are like myself, a hiapo na koa, and you were charged with ho'oponopono or the charge of making pono, ills of the past, we have to recognize that the greatest ill that exists in Hawaii today is the continual perpetuation of the fraud that the State of Hawaii continues along with the United States government in claiming sovereign dominion over my ['āina][land] [12]. And the ['āina] of ke akua. Akua [God] [13]. And that these wrongs have never been set right no matter how many protests were lodged, no matter how many investigations by the United States has [sic] been conducted, and no matter

---

12. Pukui & Elbert, *supra,* at 11.

13. Pukui & Elbert, *supra,* at 15.

how many times the president has recognized and recommended the restoration of the kingdom, that this continues to go on.

And first of all, the Hawaiian islands are not like the United States of America that's a fictitious corporation. This is a land that is owned in equity by families. The roads that they continue to say is state highways belong to private parties. There is no record of transactions. No record of conversation given. No permission given to take them in the first place. And under the international laws of military occupation, this is in violation of international law. And therefore all these things become problematic in the process of pono. And as the na koa I must take these on to address them and find a way that we can come to an understanding of that which is absolutely right.

(Footnotes added.)

Fergerstrom further stated,

The Fourteenth Amendment ... has to do with right of due process and a right of equality. It's my contention that the United States in its bringing in the organic act into the territories of Hawaii in 1900 was in gross violation of the Fourteenth Amendment of that constitution to the Hawaiian people in respect to property and civil rights.

On October 4, 2002, the State filed the "State of Hawaii's Motion in Limine to Preclude Defendant From Raising First Amendment as a Defense at Trial." The declaration of the deputy prosecuting attorney, which accompanies this motion, stated, in relevant part, as follows:

2. On September 30, 2002 and October 1, 2002 hearings were held on Defendant's Motion to Dismiss (First Amendment);

3. On October 2, 2002, this Honorable Court provided the State and Defense with a written decision denying the motion;[14]

That the State now moves to preclude the Defendant from raising a First Amendment Defense at trial.

(Footnote added.)

Immediately prior to the October 7, 2002 commencement of the trial, counsel for Fergerstrom stated, in relevant part, that "the court has ... not given any credence to Mr. Fergerstrom's testimony, the testimony of Eleanor Ahuna and Keoni Choy concerning pono. That there was a reason why his religion would not condone him following the conduct that State requires in accepting a license[.]"

Subsequently, the court orally denied Fergerstrom's two motions to dismiss and orally granted the State's motion in limine. Two written orders were entered post-trial. First, on October 21, 2002, the court entered the "Order Denying Defendant's Motion to Dismiss (First Amendment); Findings of Facts; Conclusions of Law" which states, in relevant part:

### FINDINGS OF FACT

1. Despite [Fergerstrom's] stated subjective intent that his conduct contains a particularized message, that is an intent not to recognize the legitimacy of the State of Hawaii, it is highly unlikely that this message would be understood by those who viewed it.

2. [Fergerstrom] has failed to show that enforcement of traffic laws against him results in an unconstitutional deprivation of his right to free exercise of religion.

3. [Fergerstrom] has not shown that noncompliance with traffic laws is an integral part of his religious faith. [Fergerstrom's] testimony is that he has elected noncompliance with traffic laws as his way of not acknowledging the legitimacy of the State of Hawaii. This is an expression of [Fergerstrom's] own personal philosophy and way of life and not an integral part of native Hawaiian religion.

---

14. We searched the record on appeal for the court's October 2, 2002 written decision denying the motion, but did not find it. *See Donnelly v. Donnelly*, 98 Hawai'i 280, 281 n. 1, 47 P.3d 747, 748 n. 1 (App.2002) (minute orders are not part of the record on appeal). The denial of the motion to dismiss was eventually formalized in the October 21, 2002 Order Denying Defendant's Motion to Dismiss (First Amendment).

4. Compliance with traffic laws would not result in the virtual inhibition of his native Hawaiian religion or the practice of his faith. Even if he were to comply with traffic laws, [Fergerstrom] would be able to undertake spiritual practices, meet with his spiritual leaders, study his religion and instruct followers and observers as to his religious tenets.

## CONCLUSIONS OF LAW

1. Under *State v. Hanapi*, 89 Hawai'i 177, [970 P.2d 485] (1998), the burden is on the criminal defendant to prove that the defendant's conduct is a constitutionally protected activity. *Id.* at 183, [970 P.2d 485].

2. In this case, ... Fergerstrom has failed to show that his alleged failure to comply with traffic laws constitutes speech protected by the First Amendment. The failure to comply with traffic laws is not "sufficiently imbued with elements of communication to fall within the scope of the First Amendment." *Texas v. Johnson*, 491 U.S. 397, 404, [109 S.Ct. 2533, 105 L.Ed.2d 342] (1974). Despite [Fergerstrom's] stated subjective intent that his conduct contains a particularized message, that is an intent not to recognize the legitimacy of the State of Hawaii, it is highly unlikely that this message would be understood by those who viewed it. *Id.* ....

3. Further, [Fergerstrom] has failed to show that enforcement of traffic laws against him results in an unconstitutional deprivation of his right to free exercise of religion. In *State v. Blake*, the Hawaii Intermediate Court of Appeals (the "ICA") applied the test set forth in *State v. Andrews*, 65 Haw. 289, 291, [651 P.2d 473] (1982). *State v. Blake*, 5 Haw.App. 411, 413, [695 P.2d 336] (1982). However, in *State v. Blake*, the ICA went on to state that in order to prove an unconstitutional deprivation of a right to free exercise of religion, the defendant must:

establish "that such practice is *an integral part of a religious faith* and that the prohibition ... results in a *virtual inhibition of the religion or the practice of the faith.*" *People v. Mullins*, 50 Cal.

App.3d 61, 70, [123 Cal.Rptr. 201,] 207 (1975) (emphasis in original).

*State v. Blake*, 5 Haw.App. at 417, [695 P.2d 336].

4. According to *People v. Mullins*, this is a matter of law which the court is to determine. *People v. Mullins*, 123 Cal. Rptr. at 207.

. . . .

## ORDER

IT IS HEREBY ORDERED that the Defendant's Motion to Dismiss (First Amendment) is hereby DENIED.

Second, on January 30, 2003, the court entered the "Order Granting State of Hawaii's Motion in Limine to Preclude Defendant From Raising First Amendment as a Defense at Trial."

The jury trial commenced on October 7, 2002. On October 9, 2002, during a conference before the jury was brought in, the following was stated:

THE COURT: And how is it you want to deal with Mr. Choy?

[COUNSEL FOR FERGERSTROM]: Yes, Your Honor. I would ask that he be brought into the presence of the court, and Mr. Choy can state his intent, unless otherwise ordered, to appear in traditional Hawaiian spiritual garb. And the court can make its ruling and advise Mr. Choy of what the court's ruling is.

. . . .

THE COURT: Mr. Choy, I advised [counsel for Fergerstrom] earlier that if you were to testify, that I would ask, and if necessary order, you to wear western clothing. Do you want to take a position regarding that? State your objection.

MR. CHOY: Yes. This is ... my traditional dress. This is my uniform.

THE COURT: Okay. If you are to testify, I'm going to specifically order that you appear in the courtroom to testify in western clothing.

MR. CHOY: That's an order?

THE COURT: It will be an order.

Thereafter, on October 9, 2002, Ahuna testified, in relevant part, as follows:

Q And are you familiar with the—the dress that Mr. Fergerstrom is wearing?

A Yes, I am.

Q Can you describe it.

A If Mr. Fergerstrom will rise, I will describe the attire. The malo is ... the clothing that was worn by all the men in old Hawaii. But certain colors were set aside for the warriors. The kikepa that he wears across his shoulder and mostly his body is a wrap that they wear when they come before a court or anyone making a decision. That is the only time that they do that, or when they're marching. When they're nakoa [sic], they only wear their malo.

. . . .

Q Is the kikepa a sign of respect?

A Yes, it is.

Q Is it formal attire?

A It is a formal attire for the warriors.

Thereafter, on the same day, Choy testified, in relevant part, as follows:

Q You're dressed in a combination of western wear and traditional Hawaiian wear, as I understand it, today, is that correct?

A I was ordered by the court to wear western attire.

Q And so you're complying with the court's order or request, is that correct?

A I wear this under protest.

. . . .

A I was ordered. For I feel personally violated.

. . . .

A Under—under coercion and intimidation for fear for my kumu [teacher][15], because my testimony would not be allowed if I didn't come in like this.

Q I understand. Notwithstanding those concerns, you are prepared to testify truthfully?

A Yes.

Q What do you call the wear that you have on, the Hawaiian wear?

A Kihei [rectangular tapa garment worn over one shoulder and tied in a knot][16]. I wear as a show of respect.

Q And typically how is a kihei worn?

A Draped over the shoulder, tied on the side. The flap's supposed to be underneath.

Q And when did you first come to wear a kihei?

. . . .

A Well, from—I remember as a child I was wearing this during processions and religious observances.

Q And typically a kihei is worn with no undergarment, is that correct?

A It's worn over a malo.

. . . .

A I would usually wear just my malo, and I put on a kihei for formal occasions as a show of respect.

Q So today you attempted to wear your kihei and a malo alone as a show of respect?

A As show of respect.

Q And you're also wearing western garb, is that correct?

A I was forced to wear this.

. . . .

Q Now, Mr. Choy, do you have a State of Hawaii driver license?

A Yes, I do.

Q And why do you have a State of Hawaii driver license?

A I've been ordered not to get arrested.

Q Who ordered you not to get arrested?

A My ali'i.

Q And again your ali'i are who?

A ... [T]he ali'is ... are the descendants of the monarchy. They are the true blood of the royal family who are still alive, and, well, and they're living today, and these are the people who I follow.

Q Do you belong to that blood line?

---

**15.** Pukui & Elbert, *supra,* at 182.

**16.** Pukui & Elbert, *supra,* at 147.

A Yes, I do.

Q Do you choose to have a license?

A If it was up to me, I would not have a license that recognizes the state.

Q Now, ... can you explain, ... your concept of pono.

A Well, pono or ho'oponopono means to correct what is wrong. If something is not pono, it's wrong. It has to be corrected.

Q Who decides whether something is pono or not?

A Our spiritual advisors, our ali'i, all under Akua. Has to be right with [A]kua.

. . . .

Q 'Ae means yes?

A 'Ae.

. . . .

Q Mr. Choy, do you feel that you can break the laws of the State of Hawaii?

A Yes.

Q So these laws don't apply to you?

A No, they don't.

Q But still you have a ... State of Hawaii driver license?

A Under duress.

. . . .

Q You were ordered not to get arrested, so you got a State of Hawaii driver's license?

A Yes.

. . . .

Q ... You don't feel that any of the State of Hawaii laws apply to you?

A They are foreign laws from a foreign government in the Kingdom of Hawaii. They are foreign laws.

. . . .

Q Do you feel that the laws of the State of Hawaii apply to you?

A They are foreign laws. No, they don't.

(Footnotes added.)

During the trial, on October 10, 2002, the court instructed the jury, in relevant part, as follows:

The law recognizes the choice of evils defense, also referred to as the necessity defense.

The choice of evils defense justifies the defendant's conduct if the defendant reasonably believed—reasonably believed that compliance with the law would have resulted in greater harm to himself or another than the harm sought to be prevented by the law defining the offense charged.

. . . .

Accordingly, if the prosecution has not proved beyond a reasonable doubt that the defendant's conduct was not legally justified by the choice of evils defense, then you must find the defendant not guilty of the offenses charged against him.

On October 14, 2002, in his closing argument to the jury, counsel for Fergerstrom stated, in relevant part, as follows:

The state didn't talk about the nature and purpose of the person's conduct or the defendant's conduct, but you have evidence in front of you what the nature and purpose of that conduct was, why he didn't have a license. He must not have a license, because it is his mission to restore and perpetuate the government that was wrongfully overthrown by the United States government in 1893.

On October 14, 2002, the jury found Fergerstrom guilty as charged. The court then told Fergerstrom that "I'm going to order that you appear for the sentencing hearing in western attire."

On December 11, 2002, Fegerstrom filed a "Motion for Stay of Sentence Or, In the Alternative, For Release On Bail Pending Appeal." This motion cited HRS §§ 804–3 and 804–4. On December 11, 2002, the court orally granted Fergerstrom's motion for stay of sentence pending appeal and sentenced Fergerstrom as follows:

Count I: Incarceration for one year; DETF [17] $7; administrative cost $20; Crime Victim Compensation Fee $50;

Count II: $100 fine; $15 administrative cost;

17. Driver Education and Training Fund, HRS § 286G–2 (Supp.2003).

Count III: $100 fine; $15 administrative cost; and

Count IV: $1,500 fine to be suspended [18] if proof of current insurance policy is provided; DETF $7; administrative cost $20; Crime Victim Compensation Fee $25; a nonrefundable insurance policy shall be kept in force for 6 months; suspension of registration plates of vehicles; and a concurrent thirty day term of incarceration.

On December 13, 2002, the court filed the Judgment; Guilty Conviction and Sentence "nunc pro tunc to 12/11/02".[19]

On January 8, 2003, Fergerstrom filed a notice of appeal from the December 13, 2002 Judgment. The appeal was assigned to this court on September 15, 2003.

### III.

### DISCUSSION

### A.

Fergerstrom contends that

[t]he [court] misapprehended or ignored the central role of hoʻoponopono or making right which is an undisputed, core feature of Mr. Fergerstrom's religion. The [court] also misapprehended or ignored evidence that Mr. Fergerstrom's religious beliefs and practices are inseparable from the political consequences flowing from the illegal overthrow of the Hawaiʻian [sic] kingdom. As Mr. Fergerstrom testified, any coerced acceptance that his right to travel by vehicle in Hawaiʻi is at the pleasure and license of an illegitimate sovereign, i.e. the State of Hawaiʻi, presents irreconcilable conflict and is not *pono*. Mr. Fergerstrom is committed to the path of *pono*. In other words, if he cannot be *pono*, Mr. Fergerstrom cannot practice his religion. Contrary to the [court's] determination, his religious pathway is blocked by the State's licensing regime.

The Third Circuit Court's blithe statement that Mr. Fergerstrom's noncompliance with State traffic laws is an expression of his own personal philosophy and not an integral part of native Hawaiʻian [sic] religion has no evidentiary support. . . .

. . . .

In its conclusion, however, [the court] unfairly parsed Mr. Fergerstrom's conduct, reducing it to a message of noncompliance with traffic laws. Mr. Fergerstrom's message, however, is much broader and incorporates a continuing, unrelenting attack on the State of Hawaiʻi's self-proclaimed legitimacy. Mr. Fergerstrom testified that all his acts are dedicated to the restoration of the legitimate Hawaiʻian [sic] government. It is true that Mr. Fergerstrom's message may not necessarily be understood when divorced from the United States government's admission in U.S. Public Law 103–150 that the 1893 overthrow of the Hawaiʻian [sic] kingdom was illegal. His message, however, is not so divorced but inextricably intertwined with such admission of illegal conduct. The jury should have been allowed to determine whether Mr. Fergerstrom's conduct, his refusal to recognize laws imposing badges of State sovereignty, including a State driver's license, comprises protected political speech. *See United States v. Eichman,* 496 U.S. 311 [310], 110 S.Ct. 2402 [2404], [110 L.Ed.2d 287] (1990). As in *Eichman,* the State's interest in traffic law enforcement is not neutral relative to a person who protests the very existence of the State. The State's driver's license and its police power enforcement of traffic laws are emblematic of the occupying government as a sovereign entity.

The State's interest in asserting its sovereignty as a component of traffic law enforcement may not arise except as when challenged by political protest. When it arises, however, the examination whether challenge to [the State's] sovereignty is legitimate political speech should be undertaken by the jury, not the Court. A strong likelihood existed that the jury, when provided with the history of the illegal over-

---

18. The sentence did not specify an expiration date for the suspension of the $1,500 fine.

19. The record does not reveal why the judgment was entered nunc pro tunc.

throw of the Hawai'ian [sic] kingdom and its effects as described in U.S. Public Law 103–150, would indeed understand Mr. Fergerstrom's resistance as protected political speech.

In short, Fergerstrom contends that the court reversibly erred in precluding the jury's consideration of Fergerstrom's First Amendment defense. We conclude that, although presented in opposition to them, Fergerstrom's argument supports the circuit court's findings and conclusions contained in the October 21, 2002 Order Denying Defendant's Motion to Dismiss (First Amendment); Findings of Facts; Conclusions of Law. We conclude that Fergerstrom's First Amendment defense was not a question for the jury.

The following three precedents are relevant: First,

[w]here a constitutional challenge on the First Amendment religion grounds is made, we apply the following test:

[T]o determine whether there exists an unconstitutional infringement of the freedom of religion, it would be necessary to examine whether or not the activity interfered with by the state was motivated by and rooted in a legitimate and sincerely held religious belief, whether or not the parties' free exercise of religion had been burdened by the regulation, the extent or impact of the regulation on the parties' religious practices, and whether or not the state had a compelling interest in the regulation which justified such a burden.

*State v. Blake,* 5 Haw.App. 411, 413, 695 P.2d 336, 337–38 (1985) (quoting *State v. Andrews,* 65 Haw. 289, 291, 651 P.2d 473, 474 (1982)).

Second, "[w]hen a criminal defendant claims to have been engaged in a constitutionally protected activity, the burden is placed on him or her to show that his or her conduct fell within the prophylactic scope of the constitution's provision." *State v. Hana-*

*pi,* 89 Hawai'i 177, 183, 970 P.2d 485, 491 (1998).

Third, appellate courts review questions of constitutional law by exercising their own independent constitutional judgment based on the facts of the case. Accordingly, they review questions of constitutional law *de novo* under the right/wrong standard. *State v. Rogan,* 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (citation omitted).

The above precedent, however, does not answer the question whether the party asserting the constitutional right has a right to have the jury decide the "facts of the case."[20] The following precedent does and the answer is no.

In *State v. Lee,* 83 Hawai'i 267, 925 P.2d 1091 (1996), a jury found the defendant guilty of attempted murder in the second degree. On appeal, the Hawai'i Supreme Court concluded, in relevant part, as follows:

Whether the prosecution has made an adequate showing of the "unavailability" of a witness—for the purpose of satisfying the confrontation clauses of the United States and Hawai'i Constitutions—is, at the first level of analysis, a question of fact for the trial court to decide, involving a determination of the nature of the prosecution's "good faith" efforts to secure the witness's presence at trial. Findings of fact are reviewed under the clearly erroneous standard.

At the second level of analysis, we ask whether the facts as found amount to a legally adequate good faith effort to confront the defendant with his accusers. This is a question of federal and/or state constitutional law, and we answer it by exercising our own " 'independent constitutional judgment [based] on the facts of the case.' " In other words, "application of constitutional principles to the facts as found ... requires us to examine the entire record and make an independent determination ... based upon that review

---

20. If the jury is permitted to decide the relevant and material facts, it would do so, and then it would apply the applicable constitutional law as stated in the court's instructions to the jury and decide the constitutional law question. If only the judge is permitted to decide the relevant and material facts, the judge would decide the applicable constitutional law, find the relevant and material facts, apply the relevant constitutional law to the relevant and material facts, and decide the constitutional law question without the involvement of the jury.

and the totality of the circumstances[.]" Only in rare instances will reviewing courts hold constitutional error to be harmless. "Under *Chapman [v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)], an error of constitutional proportions can be disregarded as harmless [only] if the prosecution proves beyond a reasonable doubt that the error 'did not contribute to the verdict obtained.'"

*Lee*, 83 Hawai'i at 273, 925 P.2d at 1097 (internal citations omitted). Although *Lee* involved the question "[w]hether the prosecution has made an adequate showing of the 'unavailability' of a witness—for the purpose of satisfying the confrontation clauses of the United States and Hawai'i Constitutions[,]" it also applies to the constitutional right violation alleged by Fergerstrom in this case. We take special note of the fact that in *Lee*, although the trial was by a jury, the Hawai'i Supreme Court concluded that "the trial court" (as opposed to the trial jury) should decide the facts relevant to the constitutional question and the appellate court should review those facts under the clearly erroneous standard.

The *Lee* Hawai'i precedent is supported by the following federal precedent:

> In *United States v. Klimavicius–Viloria*, 144 F.3d 1249 (9th Cir.1998), we held that if a statute does not expressly require proof of a nexus between the criminal conduct and the United States, proof of such a connection is not an element of the offense. In *Klimavicius–Viloria*, the defendant was prosecuted under the Maritime Drug Law Enforcement Act ("MDLEA") for possessing a controlled substance with intent to distribute it while on a vessel in international waters. We explained in *Klimavicius–Viloria* that under such circumstances a nexus requirement "is a judicial gloss applied to ensure that a defendant is not improperly haled before a [United States federal] court for trial." We held in *Klimavicius–Viloria* that proof of an implied nexus under MDLEA is "part of the jurisdictional inquiry," and as such it is a question of law which "should be decided by the court prior to trial." Assuming arguendo

that a federal nexus must be demonstrated in a prosecution pursuant to § 666 " 'sufficient to satisfy the United States' pursuit of its interests,'" the existence of that nexus is a question of law that must be decided by the court prior to trial. The district court did not err in declining to submit the federal nexus question to the jury.

*United States v. Bynum*, 327 F.3d 986, 993 (9th Cir.2003) (internal citations omitted).

### B.

 Fergerstrom contends that the court reversibly erred in denying Fergerstrom's motion to dismiss based on gross violations of the 14th Amendment of the Constitution of the United States.

In essence, Fergerstrom challenges the relevant precedent stated in *Nishitani v. Baker*, 82 Hawai'i 281, 921 P.2d 1182 (1996), and *State v. Lorenzo*, 77 Hawai'i 219, 883 P.2d 641 (1994). We affirm that relevant precedent. Whatever may be said regarding the lawfulness of the Provisional Government in 1893, the Republic of Hawai'i in 1894, and the Territory of Hawai'i in 1898, the State of Hawai'i was, on February 9, 2002, and is now, a lawful government. As noted by this court in *State v. French*, 77 Hawai'i 222, 231–32, 883 P.2d 644, 653–54 (App.1994), the State of Hawai'i has lawful jurisdiction over all persons operating motor vehicles on public roads or highways within the State of Hawai'i. Persons claiming to be citizens of the Kingdom of Hawai'i and not of the State of Hawai'i are not exempt from the laws of the State of Hawai'i applicable to all persons (citizens and non-citizens) operating motor vehicles on public roads and highways within the State of Hawai'i.

### C.

Fergerstrom contends that the court "violated Mr. Fergerstrom's due process and Sixth Amendment rights to compulsory process to present a favorable defense witness" when it ordered Choy to wear western clothing when testifying, thus precluding Choy from wearing only a malo and a kihei. More specifically, Fergerstrom argues that

[t]he value of Keoni Choy's testimony, however, was impaired to the point of loss because it was undermined by the trial court's ruling regarding traditional dress.

Mr. Fergerstrom lost the benefit of the authority of Mr. Choy's testimony because Mr. Choy was prevented from testifying in his traditional dress. . . . Although he was permitted to wear traditional Hawai'ian [sic] clothing over western wear, the effect was bizarre, insulting and undermined the value of Mr. Choy's testimony.

Instead of being allowed to present, through Mr. Choy's traditional clothing, evidence supporting the seriousness and compulsory nature of his native religion, Mr. Fergerstrom and the jury were left with a cruel joke, a forced blending of conflicting, competing sovereigns. Mr. Choy's traditional dress was permitted only as an accessory overlying the court-deemed essential western dress. . . .

Mr. Fergerstrom's religion was demeaned and his own, completely non-western attire became an oddity. Differences between Mr. Fergerstrom's dress and Mr. Choy's dress undermined the authority they presented to the jury and created a court-imposed difference between them when no such difference existed, all in violation of Mr. Fergerstrom's due process rights.

As noted above, Choy testified, in relevant part, as follows:

Q What do you call the wear that you have on, the Hawaiian wear?

A Kihei. I wear as a show of respect.

Q And typically how is a kihei worn?

A Draped over the shoulder, tied on the side. The flap's supposed to be underneath.

Q And when did you first come to wear a kihei?

. . . .

A Well, from—I remember as a child I was wearing this during processions and religious observances.

Q And typically a kihei is worn with no undergarment, is that correct?

A It's worn over a malo.

. . . .

A I would usually wear just my malo, and I put on a kihei for formal occasions as a show of respect.

Q So today you attempted to wear your kihei and a malo alone as a show of respect?

A As show of respect.

Q And you're also wearing western garb, is that correct?

A I was forced to wear this.

When Choy testified, he wore a kihei over "western garb". The record and Fergerstrom's argument leaves open the possibility that he also wore a malo under the kihei and over the "western garb". We say this especially because we would not describe the wearing of a kihei over "western garb" as "bizarre". In essence, Fergerstrom contends that Choy was not as favorable a defense witness because Choy was not allowed to dress similar to Fergerstrom.

■ The first question is whether this is an issue Fergerstrom may raise on appeal. We conclude that it is. In a jury trial, the jury decides the credibility of a witness. So long as they are unrelated to facts that cannot be considered by the jury when deciding credibility (such as race, color, creed, sex and national origin), the appearance of the witness is a fact considered by the jury when it decides this question. Thus, in Fergerstrom's case, the jury was instructed, in relevant part, as follows: "In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; . . . and all other circumstances surrounding the witness and bearing upon his or her credibility."

The second question is whether the court erred when it ordered Choy to "appear in the courtroom to testify in western clothing" and when, as stated in Fergerstrom's opening brief, it subsequently "permitted [Choy] to wear traditional Hawai'ian [sic] clothing over western wear[.]" Hawai'i does not have any relevant precedent. The precedent from other jurisdictions distinguishes (1) the mode of dress at trial of (a) a lawyer representing a party, (b) a party, and (c) a witness for a party, and (2) situations where the religious

principles of the lawyer, party, or witness required the mode of dress.

In the case of *State v. Allen,* 113 Or.App. 306, 832 P.2d 1248 (1992), the defendant's husband declined to testify as a witness for the defendant while not wearing his Muslim religious headgear and the trial court would not permit him to testify while wearing his Muslim religious headgear. The Court of Appeals of Oregon stated, in relevant part, as follows:

> Defendant requested to make an offer of proof as to the witness' religious belief. The trial court refused to allow him to take the stand for that purpose, and defendant made an offer of proof on the record during a recess when the judge was not on the bench.
>
> Defendant argues that the ruling violated her right to compulsory process under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. . . .
>
> Under UTCR 3.010(1), a trial court has discretion to exclude persons from the courtroom if they are attired in a way that detracts from the dignity of the court. A court does not exercise that discretion in a vacuum; it must balance the reasons and the need for proper courtroom attire against the results of enforcing the rule. The result here is twofold and affects the defendant's constitutional right to present her defense and the witness' constitutional right to practice his religion. Although considerations of proper attire may go beyond the mere maintenance of a dress code, a trial judge's desire simply to maintain a general dress code cannot justify an infringement of a criminal defendant's right to present an exculpatory witness, unless the attire worn by a witness would be disruptive or would create an atmosphere of unfairness.
>
> In weighing the competing interests of an appropriate courtroom atmosphere with the right of a defendant to call a witness, the court can properly consider the reasons the witness gives for not honoring the court's request to remove a particular headgear. If the witness' reasons are not substantial or are based on a belief asserted but not sincerely held, and the court determines that the attire threatens to be disruptive or is unfair, it may then be justified in excluding the witness.
>
> The court declined to hear the offer of proof, so it was not informed about the witness' religious practice or whether the belief on which it was based was sincere. The court made no findings about the reasons for excluding the witness other than the court's dress code. The state agrees that the ruling is not defensible but suggests that we remand so that the court can make findings about whether the witness' headgear would be disruptive, unfair or prejudicial and whether his religious beliefs are sincerely held. It is clear from the record that the court was enforcing a general rule that has nothing to do with considerations that are particular to this proceeding. Reconstructing the events to determine whether there was a justification other than the court's desire to enforce a general dress code would be unfair to defendant. The court erred by excluding the witness, and the error was prejudicial.

*Id.* at 308–09, 832 P.2d at 1249–50.

In the case of *Ryslik v. Krass,* 279 N.J.Super. 293, 652 A.2d 767 (App.Div.1995), the driver of the first automobile involved in a four-car, chain reaction collision sued the drivers of the other three automobiles. The driver of the fourth vehicle was a Roman Catholic priest. After the jury found the plaintiff and the priest not liable, the trial judge *sua sponte* granted a new trial regarding the liability of the drivers of the second and third vehicles and the priest on the ground that the priest was allowed to testify while wearing clerical attire.

The Superior Court of New Jersey, Appellate Division, stated, in relevant part, as follows:

> The first issue in this case relates to the judge's principal ground for granting a new trial. The trial judge determined that as Father Burla was described as a priest and was wearing his Roman collar when he testified, this was too prejudicial to the other parties. He therefore ordered a new trial at which there was to be no mention

that Father Burla was a priest, and he would be directed to wear nonclerical garb. If he refused to comply, his testimony at the first trial would be read to the jury. We disagree with this proposition. We acknowledge that "[a] trial judge has the ultimate responsibility to control the trial in the courtroom and is given wide discretion to do so." *Horn v. Village Supermarkets, Inc.*, 260 N.J.Super. 165, 175, 615 A.2d 663 (App.Div.1992), certif. denied, 133 N.J. 435, 627 A.2d 1141 (1993). But this responsibility must be exercised reasonably and within constitutional bounds. If a party is a member of the armed services, a firefighter, or a priest, when appearing in court he or she should be entitled to dress in a manner ordinary to him or her. The judge should appropriately charge, as the judge did here, that no undue weight should be given to the testimony of the particular witness by reason of a profession. [FN1] But a witness should not be artificially dressed by direction of the court.

FN1. The judge told one juror (in the presence of all):

I've got to tell you something, that there's no aristocracy in this country. And whether you wear a—as I say, a blue police uniform, a white medical lab coat, or even a black judicial robe or white collar doesn't entitle you to one bit of presumption that you're telling the truth more than anybody else.

He also preliminarily inquired of the jury as a whole:

[F]olks, one of the parties, as I indicated to you, is a—is a priest, rabbi or minister. In this case, I think it's a priest. And what I want to know is, has your experience in the—and I'm not going to ask you—I have no right to ask you what your religious preferences are or anything else like that.

But have your experiences in the past—let's say three or four years been such that you would tend to be either overly fair or antagonistic to a person of the cloth? Would there be a feeling on your part that you would clothe that person with a presumption of being incapable of telling a lie, or would that—would you have an attitude that that person probably was incapable to telling [sic] the truth?

I mean, I don't care which side it falls on, but if it falls on either side, would you feel uncomfortable and have a tendency to feel that you would be biased either too much in favor or too much against a person who was a member of the cloth who came up here to testify? Would that create problems for any of you in calling this case fairly for all of the attorneys involved and all of their clients involved? Anybody got a problem with that Great, okay.

Whether a trial court has the discretion to prevent a party from appearing in religious attire is a novel issue in New Jersey case law. We first note a February 11, 1991 memorandum from Chief Justice Robert N. Wilentz to the assignment judges, entitled "Courtroom Decorum and Respect for Courtrooms." The memo contained a directive to the trial judges not to restrict litigants from dressing as they choose. The memo stated, in pertinent part:

I do not believe we should try to influence how litigants or witnesses dress, absent something that approaches the obscene. I believe the fact finder, be it the jury or the judge, should see the litigant or witness as that person wishes to appear and reach whatever conclusions flow from that 'fact.' If a worker believes that he or she should dress the way he or she always does, I would not stop that; nor would I try to prevent that worker from dressing in a way he or she never does. I realize though this may not be in accord with present practice and welcome your views on it.

The closest New Jersey case deals with a trial judge's restriction of an attorney's attire in the courtroom. *In Matter of De Carlo*, 141 N.J.Super. 42, 357 A.2d 273 (App.Div.1976), defendant, a female attorney, was held in contempt of court for disobeying the trial court's order that she dress as he directed. The judge objected to the fact that she wore a sweater and

slacks in court. This court reversed the conviction, concluding that the record did not support a contempt finding. We did not determine whether the judge was within his power to restrict defendant's manner of dress, *Id.* at 46–47, 357 A.2d 273, but we did state that defendant's attire was not the type to be "fairly labeled disruptive, distractive or depreciative of the solemnity of the judicial process. . . ." *Id.* at 47, 357 A.2d 273.

The issue, however, has appeared elsewhere in three settings: (1) whether there may be religious dress restrictions on attorneys; (2) whether a party or witness may dress, not as a member of the clergy, but in a distinctive manner required by the person's religion, and (3) the precise issue before us, i.e., whether a priest or minister may wear clerical attire when appearing as a party or witness. While New York appears to be the jurisdiction with the most reported cases, the issue has also been discussed elsewhere.

A priest serving as an attorney may be required to wear non-clerical garb, at least where the dictates of his or her religion will not be violated. In *La Rocca v. Lane,* 77 Misc.2d 123, 353 N.Y.S.2d 867, 872 (Sup. Ct.1974), rev'd on other grounds, 47 A.D.2d 243, 366 N.Y.S.2d 456, 462 (2d Dept.) aff'd, 37 N.Y.2d 575, 376 N.Y.S.2d 93, 338 N.E.2d 606 (1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 734 (1976), the trial court held that the attorney, who was also a priest, could not wear his clerical collar while he was representing his client during a criminal trial. On appeal, the Court of Appeals agreed and held that

> the court of necessity limited defense counsel's right to free exercise of religion in that he was compelled to remove the symbol of his religious calling, a requirement of his calling which is not unconditional or beyond dispensation. The risk that a fair trial could not be had outweighed this incidental limitation.

[376 N.Y.S.2d at 102, 338 N.E.2d at 613.] However, a different rule was applied to a party where his religious principles required his mode of dress. In *Close–It*

*Enters., Inc. v. Mayer Weinberger,* 64 A.D.2d 686, 407 N.Y.S.2d 587, 588 (2d Dept.1978), a New York appellate court reversed a trial court's ruling that defendant could not wear his yarmulke in the courtroom in front of the jury. There, the defendant, after being ordered by the trial judge not to wear his yarmulke in the courtroom, elected to exclude himself from the courtroom rather than remove his skullcap which would have violated a tenet of his religion. *Id.* The Appellate Division stated that "defendant should not have been placed in the situation of having to choose between protecting his legal interests or violating an essential element of his faith." *Id.* The court held that the right of the parties to a fair trial did not outweigh defendant's right to free exercise of religion because any potential prejudice that might occur could be guarded against during the jury selection and jury instructions. *Id.* The court distinguished this case from *La Rocca v. Lane, supra.*

Similarly, in *In re Palmer,* 120 R.I. 250, 386 A.2d 1112, 1116 (1978) the trial court had refused to allow the plaintiff to wear his skullcap in the courtroom during the proceedings. Although the facts did not warrant a discussion as to whether the wearing of the skullcap would cause undue prejudice or bias, the Rhode Island Supreme Court applied the balancing test stated in *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 969–970 (1963) and held that "the state would bear a heavy burden of establishing how such actions threaten any compelling interest that the state may have in maintaining decorum in the courtroom." *In re Palmer, supra,* 386 A.2d at 1116.

Courts have also considered other manners of religious dress. In *Joseph v. State of Florida,* 642 So.2d 613, 615 (Fla.Dist.Ct. App.1994), the court quashed a trial court's order prohibiting defendant from appearing in court wearing a "sweatshirt and jeans with religious pictures and names." The Court of Appeals found on constitutional grounds that in order for the trial court to have interfered with petitioner's alleged right,

the trial justice should first have allowed petitioner to display the sincerity of his religious belief, and then should have applied the second prong of the *Sherbert* [*v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)] test by balancing the petitioner's first amendment right with the interest of the court in maintaining decorum in its proceedings by regulating dress in the courtroom.

[*Id.* at 614.]

The court also noted that this was not a case of "questionable religious garb." *Id.* at 615.[FN2]

FN2. For such a case of questionable religious garb, see, *State v. Hodges*, 695 S.W.2d 171 (Tenn.1985), where this principle was extended to the extreme. In Hodges, the Tennessee Supreme Court affirmed the appellate court's decision requiring the trial court to inquire into the religious belief of a defendant who insisted upon appearing in court "dressed like a chicken" before prohibiting defendant from doing so. The court stated that

[i]f the trial court feels the need to instruct the jurors or venire persons to disregard such religious dress in performing their duties and to explain petitioner's right, such instruction would be consistent with the First Amendment and the trial court's control of the courtroom.

[*Ibid.*]

*Close–It Enters., Palmer,* and the other allegedly obligatory religious dress cases are distinguishable from the case before us, since the original orders impinged on what the parties considered to be a religious obligation, not merely a choice of clothes. A priest, unless required by church law, may wear ordinary garb.

The Second Circuit has briefly directly addressed the issue now before us in *O'Reilly v. New York Times*, 692 F.2d 863, 869–870 n. 8 (2d Cir.1982). There, the plaintiff was a priest who wanted to represent himself pro se. *Id.* at 864–865. Although it was not one of the main issues on appeal, the court discussed in a footnote the issue of the plaintiff appearing in his Roman collar. *Id.* at 869–870. The court distinguished the facts of this case from those of *La Rocca v. Lane, supra,* in that "Rev. O'Reilly is not a lawyer who happens to be a priest; he is a priest who happens to be a pro se plaintiff...." *Id.,* 353 N.Y.S.2d at 870. The court explained that

any prejudice to [defendant] could be cured by voir dire and jury instructions. It should be enough to explain that Rev. O'Reilly is simply being permitted to wear his everyday dress and that no inference as to his religious standing is to be inferred therefrom.

[*Id.*]

In *People v. Drucker*, 100 Misc.2d 91, 418 N.Y.S.2d 744 (Crim.Ct.1979), the court, stating that it was following *Close–It Enters., Inc. v. Weinberger, supra,* denied defendant's motion to preclude the complainant, an Episcopalian priest, from testifying in religious dress. The court stated that the potential for bias could be addressed by less intrusive means. *Id.,* 418 N.Y.S.2d at 746–747. The court opined that

[o]ne apparently does not trust the American Jury system if he believes that after an agonizing voir dire and a strong charge, that the jury will be prepared to discount all the evidence, and the myriad factors gleaned from days of testimony, only to decide the case upon the fact that one witness wore a clerical collar.

[*People v. Drucker, supra, Id.* at 747.]

We see no reason to depart from *O'Reilly* and *Drucker.* Any potential bias that could be caused by defendant's religious garb can be and here actually was addressed during the jury selection process and generally should be reiterated during the jury charge. This is a less intrusive alternative than restricting defendant's manner of dress and impinging on his possible constitutional right to free exercise of religion. [FN3] In the instant case, the judge gave the jury sufficient preliminary information on the subject; the omission of a reiteration in the final charge was, at worst, harmless error.

FN3. Since there is a non-constitutional basis for determining this case, we need not decide the constitutional questions posed by defendants Burla and the Church. We merely note the First Amendment of the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting establishment of religion, or prohibiting the free exercise thereof." The First Amendment has been applied to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "[The First Amendment] applies to the judiciary as well as the executive and legislative branches of government." *In re Adoption of E.*, 59 N.J. 36, 51, 279 A.2d 785 (1971). The current standard in determining whether an individual's First Amendment right to free exercise of religion is violated is set forth in *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963) and recently reiterated in 42 U.S.C.A. § 2000bb, The Religious Freedom Restoration Act ("RFRA"). RFRA states:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

[42 U.S.C.A. § 2000bb(1)(b).]

We, therefore, determine that it was a mistaken exercise of the court's discretion to order a new trial based upon Father Burla's clerical attire and to have required that at any retrial defendant would be prohibited from wearing his clerical attire or from being identified as a priest.

*Ryslik v. Krass*, 279 N.J.Super. at 297–303, 652 A.2d at 769–72.

■ In our view, absent a mode of dress that is obscene, disruptive, distractive, or depreciative of the solemnity of the judicial process, or that will create an atmosphere of unfairness, a party or a witness may decide what to wear in court. We agree with *Ryslik* that any positive or negative potential bias that might be caused by any other attire worn by the party or the witness can and should be addressed during the jury selection process, the trial, and in the instructions to the jury.

It appears that at the trial, (a) Fergerstrom was permitted to wear only a *malo* and a *kikepa*, and (b) Choy's reason for wanting to wear only a *malo* and a *kihei* was because he was a *hiapo na koa* and it is his "traditional dress", his "uniform". The record does not reveal how often and under what circumstances in other situations Choy wore his "uniform", "western clothing", or other types of attire.

The record does not reveal the court's reason(s) (a) for not allowing Choy to appear at the trial wearing only a *malo* and a *kihei*, and (b) requiring Choy to appear at the trial wearing "western clothing".[21] We are thus unable to determine if the court's reason(s) was(were) valid.

■ When the court required Choy to appear at the trial wearing "western clothing", Fergerstrom had the following three choices: (1) not to call Choy as a witness; (2) to call Choy as a witness wearing western clothing and present evidence to the jury (i) that Choy was dressed as ordered by the court and (ii) how he would have dressed if he had a choice; or (3) after seeking and obtaining permission from the court to do so, call Choy as a witness wearing a *kihei*, and possibly a *malo*, over western clothing, and present evidence to the jury of the reason for his alleged "bizarre" attire. Fergerstrom opted for choice (3). Thus, during the trial, Fergerstrom sought to use Choy's alleged "bizarre" attire to persuade the jury to sympathize with Fergerstrom's political views. Having not succeeded in using Choy's alleged "bizarre" attire to his benefit at trial, Fergerstrom now in this appeal seeks to use Choy's

---

**21.** The record does not reveal exactly what kind of clothing the court had in mind when it ordered Choy to "appear in the courtroom to testify in western clothing" nor does it reveal why it required "western clothing" as opposed to all of the many other options common in Hawai'i.

alleged "bizarre" attire as a ground for a new trial. To the extent, if any, that "the effect [of the western-Hawaiian combination] was bizarre, insulting and undermined the value of Mr. Choy's testimony" and "Mr. Fergerstrom and the jury were left with a cruel joke", those consequences were caused by Choy's opting for choice (3) and cannot be used by Fergerstrom as a reason for seeking to vacate the jury's verdict.

Hawai'i Rules of Penal Procedure Rule 52(a) provides, in relevant part, that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The Hawai'i Supreme Court has stated that "error, however, should not be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled." *State v. Sprattling*, 99 Hawai'i 312, 320, 55 P.3d 276, 284 (2002) (internal quotation marks, citation, and brackets omitted). Under the harmless error standard, this court must "determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Pauline*, 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002) (internal quotation marks and citation omitted). "A constitutional error is harmless as long as the court is able to declare a belief that it was harmless beyond a reasonable doubt." *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 245, 953 P.2d 1315, 1343 (1998) (internal quotation marks, citation, brackets, and ellipsis omitted).

Assuming the court erred when it required Choy to appear in court to testify "in western clothing", the question is whether the error was harmless beyond a reasonable doubt. In Fergerstrom's case, the jury saw how Fergerstrom was dressed and was fully informed of the reasons why Choy was dressed as he was dressed and how Choy would have been dressed if he had a choice. In light of the record, we conclude that the court's error, if any, was harmless beyond a reasonable doubt.

## IV.

## CONCLUSION

Accordingly, we affirm the December 13, 2002 Judgment.

